**REVERSE and RENDER dismissal of cause; Opinion Filed August 5, 2013.**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

_____

**No. 05-13-00197-CV**
_____

**BOB MONTGOMERY CHEVROLET, INC.**
**D/B/A BOB MONTGOMERY COLLISION, Appellant**
**V.**
**DENT ZONE COMPANIES, Appellee**

**On Appeal from the 95th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-12-06337-D**

## OPINION

Before Justices Moseley, Fillmore, and Myers
Opinion by Justice Myers

Bob Montgomery Chevrolet, Inc. d/b/a Bob Montgomery Collision appeals the trial

court's denial of its special appearance in this suit brought by Dent Zone Companies. *See* TEX.

CIV. PRAC. & REM. CODE ANN. § 51.014(a)(7) (West Supp. 2012). Montgomery brings five

issues asserting the trial court erred by denying its special appearance. The parties' arguments

include whether a written contract incorporated by reference terms and conditions, including a

forum-selection clause, listed on an internet web site. We conclude the forum-selection clause

was not incorporated by reference and the trial court erred by denying Montgomery's special

appearance. We render judgment dismissing the cause against Montgomery for want of personal

jurisdiction.

## BACKGROUND

Montgomery is an automobile dealership in Louisville, Kentucky. The company does not sell any cars in Texas, advertise or solicit in Texas, or otherwise overtly conduct business in Texas. The company has a "collision center" that repairs vehicles. Dent Zone is a company providing "paintless dent repair" service.

In April 2012, a hailstorm struck Louisville, damaging many vehicles in the area. Duane Geise, a representative of Dent Zone, approached Anthony Rich, the manager of Montgomery's collision center, about making Montgomery a certified repair center in Dent Zone's "PDR Linx Service Program." If Montgomery became a certified repair center, Dent Zone would send its technicians to Montgomery's premises to perform paintless dent repairs, Dent Zone and insurance companies would direct their customers with hail damage to Montgomery's location to have dent repair performed, and Montgomery would receive a percentage of the payments for dent repair. Geise showed Rich Dent Zone's one-page application to become a certified repair center for Dent Zone.[1] After some negotiating, Rich and Geise agreed on Montgomery receiving

---

[1] The one-page application, as relevant to this opinion, provided:

We are pleased that you are joining our team of Certified Repair Centers. "We" and "Our" will refer to PDR LINX (**PDR LINX**<sup>SM</sup>) and "You" will refer to you, the Certified Repair Center.

**PDR LINX SERVICE PROGRAM**

We have developed a network of Certified Technicians who perform paintless dent repair ("PDR") in accordance with Our standards. If there is a hail event in your area, Our Certified Technicians will perform PDR services at our Certified Repair Centers, including all of Your customers, all referrals to You from insurance Companies, and any vehicles directed to Your location by Us. Additional benefits, qualifications and details of the PDR LINX Service Program are available for your review at our website: http://www.linxmanager.com/pdf/CRCTermsConditions.pdf

**YOUR COMMISSION WILL BE 25% OF GROSS PDR SERVICES AND R&I SERVICES FOR EACH INVOICE GENERATED BY THE CRC.**

We provide a Lifetime Limited Warranty for all PDR services. You will be an independent contractor working within the PDR LINX Service Program. You are free to perform non-PDR repairs. Most importantly, You will enjoy the benefits of Our network of nationally recognized companies who use and trust the **PDR LINX**<sup>SM</sup> name.

You will become a "Certified Repair Center" as detailed in our PDR LINX Service Program after your signed application is accepted by us. Start enjoying the benefits of PDR LINX today!

Prior to acceptance as a CRC, PDR LINX may check your credit.

APPLICANT:                                          ACCEPTED:

By:_ / T. Rich / _____        By:_ / [illegible] / _____

twenty-five percent of the payments for dent repair. The application also stated, "Additional benefits, qualifications and details of the PDR LINX Service Program are available for your review at our website: http://www.linxmanager.com/pdf/CRCTermsConditions.pdf." The website consisted of a two-page document (the internet document) listing terms and conditions for the PDR Linx Service Program agreement, including what Dent Zone asserted was a minimum six-month contractual term, a choice-of-law provision making Texas law applicable to the agreement, and a forum-selection clause stating that any suit between the parties would be heard in Dallas County, Texas.[2] Geise did not tell Rich about the forum-selection clause, and he told Rich only about the benefits of the program. Geise testified he told Rich that "the terms and conditions and additional information" about the program were listed at the internet link in the middle of the page, and he told Rich to go to the website and look at them. Rich told Geise he needed to take the information to Steven Montgomery, the dealership's general manager, and

---

| Certified Repair Center Representative | PDR LINX (a division of Dent Zone Companies, Inc.) |
|---|---|

[2] The internet document included the following:

**CERTIFIED REPAIR PROGRAM**
**PDR LINX PROGRAM**

We are pleased that you are considering our invitation to become part of our team of Certified Repair Centers ("CRC") under our PDR LINX program. To help you evaluate what will be expected of you, and what you can expect from us, we have put together this site to set forth, in detail the terms and conditions of the Program. By signing the application to become a CRC, you are agreeing to the terms and conditions of this Program as outlined herein, or as amended from time to time.

. . . .

ADDITIONAL TERMS AND CONDITIONS

. . . .

The term of this Agreement shall be six (6) months or for the length of the storm from the Effective Date, unless terminated with 30 days advance written notice provided by either party. . . .

This Agreement shall be construed under and in accordance with the laws of the State of Texas. You hereby submit to the jurisdiction of the courts of the State of Texas which shall be the sole and exclusive jurisdiction for any legal dispute between us. Venue for any legal dispute shall be in Dallas County in the State of Texas, and both parties waive their right to a jury trial. This Agreement constitutes the final and complete agreement of the parties. The Agent of Record is 'independent' and has NO authority to modify, change or add to this Agreement or Our obligations or make any representations on Our behalf without prior written Corporate Approval. Aside from this Agreement, there exists no other agreement or understandings, whether orally, or in writing between the parties relating to the legal relationship set forth herein.

The internet document also included a limited warranty, indemnity, and details regarding division of collected funds.

discuss it with him, and he told Geise to come back the next day.  When Geise returned, Rich told him "Mr. Montgomery and the powers that be" had approved the contract, and Rich signed the application.

Dent Zone's technicians came to Montgomery's location, and Montgomery provided space for them to perform the paintless dent repairs.  For a few weeks, the parties operated amicably:  automobile insurers directed their customers with hail damage to Montgomery for dent repair, they paid Montgomery for the repairs, and Montgomery remitted three-fourths of the payments to Dent Zone and kept one-fourth, over $30,000, for itself.  After a few weeks, problems arose, and Rich told Geise that Montgomery was canceling the contract with Dent Zone.  Geise told Rich that the terms and conditions for the contract listed on the website included a minimum six-month term, but Rich required Dent Zone to leave Montgomery's premises.  Geise asked if Dent Zone could continue its work through the weekend to finish the cars whose dent repairs were not completed, and Rich agreed.  At the end of the weekend, Dent Zone left the premises.  Geise testified that Montgomery never sent Dent Zone its share of the funds Montgomery collected for Dent Zone's work over that weekend.

Dent Zone brought suit against Montgomery in Dallas for breach of contract, alleging Montgomery "has consented to suit in Texas by the terms of the contract."  Montgomery filed a special appearance.  At the hearing on the special appearance, the evidence presented was Geise's testimony in court, the affidavits of Anthony Rich and Steven Montgomery, and various documents including the application, a printout of the internet document, checks from Montgomery to Dent Zone, and invoices and other records.  The trial court denied the special appearance and made findings of fact and conclusions of law in support of its decision.

## SPECIAL APPEARANCE

In its first four issues, Montgomery contends (1) the trial court erred by denying Montgomery's special appearance, (2) Montgomery sustained its burden of negating all bases of jurisdiction pleaded by Dent Zone, (3) the trial court erred by concluding Montgomery waived and consented to jurisdiction, and (4) there was legally and factually insufficient evidence to support the trial court's findings of fact and conclusions of law that Montgomery had knowledge of and agreed to the forum-selection clause in the internet document.

### Standard of Review

Whether a trial court has personal jurisdiction over a nonresident defendant is a question of law. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 790–91 (Tex. 2005); *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). Because the trial court's exercise of personal jurisdiction over a nonresident defendant is one of law, an appellate court reviews the trial court's determination of a special appearance de novo. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007); *BMC Software*, 83 S.W.3d at 794. However, the trial court must frequently resolve fact questions before deciding the jurisdictional question. *BMC Software*, 83 S.W.3d at 794; *Capital Tech. Info. Servs., Inc. v. Arias & Arias, Consultores*, 270 S.W.3d 741, 748 (Tex. App.—Dallas 2008, pet. denied) (en banc).

The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the Texas long-arm statute. *Moki Mac*, 221 S.W.3d at 574; *BMC Software*, 83 S.W.3d at 793. The nonresident defendant then has the burden of negating all bases of jurisdiction alleged in the plaintiff's petition. *Moki Mac*, 221 S.W.3d at 574; *BMC Software*, 83 S.W.3d at 793.

**Findings of Fact and Conclusions of Law**

A trial court's findings of fact in a nonjury trial carry the same force and dignity as a jury's verdict on jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *Kahn v. Imperial Airport, L.P.*, 308 S.W.3d 432, 436–37 (Tex. App.—Dallas 2010, no pet.). When we review a trial court's findings of fact for legal and factual sufficiency, we use the same standards of review we use when determining if sufficient evidence exists to support a jury's answers. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Thornton v. Dobbs*, 355 S.W.3d 312, 315 (Tex. App.—Dallas 2011, no pet.). When a trial court enters findings of fact and conclusions of law, we "indulge every reasonable presumption in favor of the findings and judgment of the trial court, and no presumption will be indulged against the validity of the judgment." *Vickery v. Comm'n for Lawyer Discipline*, 5 S.W.3d 241, 252 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). In a bench trial, the trial court judges the credibility of the witnesses, determines the weight of testimony, and resolves conflicts and inconsistencies in the testimony. *See Sw. Bell Media, Inc. v. Lyles*, 825 S.W.2d 488, 493 (Tex. App.—Houston [1st Dist.] 1992, writ denied). As long as the evidence falls "within the zone of reasonable disagreement," we will not substitute our judgment for that of the fact-finder. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005).

In a legal sufficiency review, we view the evidence in the light most favorable to the fact-finding, credit favorable evidence if a reasonable fact-finder could do so, and disregard contrary evidence unless a reasonable fact-finder could not. *See id.* at 827. "[F]indings of fact bind an appellate court only if the findings are supported by evidence of probative force." *Thomas v. Casale*, 924 S.W.2d 433, 437 (Tex. App.—Fort Worth 1996, writ denied). Unchallenged findings of fact are binding on the appellate court "unless the contrary is established as a matter of law, or if there is no evidence to support the finding." *Id.* (quoting

*McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986)).  Anything more than a scintilla of evidence is legally sufficient to support the finding.  *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998).  In a factual sufficiency review, we view all the evidence in a neutral light and set aside the finding only if the finding is so contrary to the overwhelming weight of the evidence such that the finding is clearly wrong and unjust.  *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam); *Morris v. Wells Fargo Bank, N.A.*, 334 S.W.3d 838, 842 (Tex. App.—Dallas  2011, no pet.).

We review de novo a trial court's conclusions of law.  *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).  A conclusion of law is erroneous as a matter of law if the factual findings supporting the conclusion are not supported by any evidence.  *Wright Group Architects-Planners, P.L.L.C. v. Pierce*, 343 S.W.3d 196, 205 (Tex. App.—Dallas  2011, no pet.).  If we determine that the trial court made an erroneous conclusion of law, we will not reverse if the trial court rendered the proper judgment.  *See BMC Software*, 83 S.W.3d at 794.  We uphold conclusions of law if the judgment can be sustained on any legal theory supported by the evidence.  *Adams v. H & H Meat Prods.*, *Inc.,*  41 S.W.3d 762, 769 (Tex. App.—Corpus Christi 2001, no pet.).

**Personal Jurisdiction**

The Texas long-arm statute permits Texas courts to exercise jurisdiction over nonresident defendants that do business in Texas.  *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 17.041–.045 (Vernon 2008); *PHC–Minden, L.P. v. Kimberly–Clark Corp.*, 235 S.W.3d 163, 166 (Tex. 2007); *BMC Software*, 83 S.W.3d at 795.  Under the statute, a nonresident does business in Texas if he: (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state; (2) commits a tort in whole or in part in this state; or (3) recruits Texas residents, directly or through an intermediary located in this state, for employment

inside or outside this state. TEX. CIV. PRAC. & REM. CODE ANN. § 17.042. The broad language of section 17.042 extends Texas courts' personal jurisdiction "as far as the federal constitutional requirements of due process will permit." *PHC–Minden*, 235 S.W.3d at 166 (quoting *U–Anchor Adver., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977)).

The Due Process Clause of the Fourteenth Amendment operates to limit the power of a state to assert personal jurisdiction over a nonresident defendant. *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano Cnty.*, 480 U.S. 102, 108 (1987); *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 413–14 (1984). The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72 (1985); *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 294 (1980); *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945). Under the Due Process Clause, personal jurisdiction over a nonresident defendant is constitutional when the nonresident defendant has established minimum contacts with the forum state and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Burger King*, 471 U.S. at 476; *Int'l Shoe*, 326 U.S. at 320. However, personal jurisdiction is a waivable right, and a party may agree to a forum's jurisdiction. *Burger King*, 471 U.S. at 472 n.14.

In this case, the only basis for personal jurisdiction Dent Zone alleged was that Montgomery "has consented to jurisdiction in Texas by the terms of the contract."

### Consent to Jurisdiction

Montgomery contends the trial court erred by concluding Montgomery consented to jurisdiction through the forum-selection clause in the internet document. Montgomery asserts the forum-selection clause was not incorporated by reference into the parties' contract, and that the court erred by concluding Montgomery had knowledge of and agreed to the clause.

*Incorporation by Reference*

Dent Zone alleged Montgomery consented to the jurisdiction of the Texas courts by agreeing in the internet document "to submit to the jurisdiction of the courts of the State of Texas which shall be the sole and exclusive jurisdiction for any legal dispute between us." Montgomery asserts the internet document was not part of the contract;[3] Dent Zone contends the internet document was incorporated by reference into the contract.

When construing a contract, our primary goal is to determine the parties' intent as expressed in the terms of the contract. *Chrysler Ins. Co. v. Greenspoint Dodge of Hous., Inc.*, 297 S.W.3d 248, 252 (Tex. 2009); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Unsigned documents may be incorporated into the parties' contract by referring in the signed document to the unsigned document. *Owen v. Hendricks*, 433 S.W.2d 164, 167 (Tex. 1968). The language used to refer to the incorporated document is not important as long as the signed document "plainly refers" to the incorporated document. *Id.*; *In re C & H News Co.*, 133 S.W.3d 642, 645 (Tex. App.—Corpus Christi 2003, orig. proceeding). Documents incorporated into a contract by reference become part of that contract. *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010) (orig. proceeding) (per curiam). When a document is incorporated into another by reference, both instruments must be read and construed together. *In re C & H News Co.*, 133 S.W.3d at 645–46.

Plainly referring to a document requires more than merely mentioning the document. *See Trico Marine Servs., Inc. v. Stewart & Stevenson Technical Servs., Inc.*, 73 S.W.3d 545, 549–50 (Tex. App.—Houston [1st Dist] 2002, mandamus denied). The language in the signed document must show the parties intended for the other document to become part of the

---

[3] Montgomery argues we should apply Kentucky law to the determination of whether the internet document with the forum-selection clause was incorporated by reference into the contract. In the trial court, Montgomery did not assert Kentucky as the appropriate choice of law, did not object to Dent Zone's arguments applying Texas law to the incorporation-by-reference issue, and Montgomery cited only Texas law on the issue. By failing to urge application of Kentucky law in the trial court and by failing to object to Dent Zone's argument applying Texas law, Montgomery waived its choice-of-law argument. *See Gen. Chem. Corp. v. De La Lastre*, 852 S.W.2d 916, 920 (Tex. 1993); *Daimler-Chrysler Motors Co., LLC v. Manuel*, 362 S.W.3d 160, 196–97 (Tex. App.—Fort Worth 2012, no pet.). Accordingly, we apply Texas law to the determination of whether the internet document was incorporated by reference.

agreement. *See One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 267 (5th Cir. 2011) (citing 11 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 30:25, at 234 (4th ed. 1999) ("in order to uphold the validity of terms incorporated by reference, it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms")); 17A C.J.S. *Contracts* § 402 (2011) ("For an incorporation by reference to be effective, it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms.").

No Texas case has expressly held that the complete incorporation by reference of another document requires the original document show the parties intended for the referenced document to become part of the contract. However, the requirement for such a showing is supported by the general principle of contract law that reference to a document for a particular purpose incorporates that document only for the specified purpose. *See, e.g.*, 17A C.J.S. *Contracts* § 402 (2011). In *Valero Marketing & Supply Co. v. Baldwin Contracting Co.*, No. H-09-2957, 2010 WL 1068105 (S.D. Tex. Mar. 19, 2010), the issue was whether a forum-selection clause was incorporated by reference. In that case, the defendant purchased asphalt from the plaintiff, and the parties' signed contract stated, "All prices quoted above are subject to Valero's General Terms and Conditions for Petroleum Product Purchases/Sales." *Id.* at *1, 3. The General Terms and Conditions included a forum-selection clause. *Id.* at *3. The district court concluded the incorporation of the General Terms and Conditions did not extend to the forum-selection clause because it was not relevant to the quotation of prices, *see id.* at *5, and the incorporating language did not "suggest that Defendant is bound by all of the General Terms and Conditions." *Id.* (emphasis omitted); *see also LeBlanc, Inc. v. Gulf Bitulithic Co.*, 412 S.W.2d 86, 93 (Tex. Civ. App.—Tyler 1967, writ ref'd n.r.e.) (general contract stated subcontract incorporated terms of general contract "only insofar as they are applicable to this Sub-Contractor," which showed

parties did not intend for subcontract to incorporate by reference all the terms of the general contract). In other words, the referring language in the original document must demonstrate the parties intended to incorporate all or part of the referenced document.

In this case, the signed application stated Montgomery would "become a 'Certified Repair Center' as detailed in our PDR LINX Service Program," and would "be an independent contractor working within the PDR LINX Service Program." The application also stated, "Additional benefits, qualifications and details of the PDR LINX Service Program are available for your review at our website: http://www.linxmanager.com/pdf/CRCTermsConditions.pdf." The question is whether this last-quoted sentence incorporated the internet document by reference.

The language, "Additional benefits, qualifications and details of the PDR LINX Service program are available for your review at our website: http://www.linxmanager.com/pdf/CRCTermsConditions.pdf" does not state the internet document is incorporated by reference into the parties' agreement, does not plainly refer to additional terms and conditions in the internet document as becoming part of the parties' agreement, and does not otherwise suggest that the parties intended for the internet document to become part of their agreement. Instead, this language indicates that the internet document contained informative material only, not binding terms and conditions intended to be part of the parties' contract.

None of the cases Dent Zone cites involved the type of language in this case. Instead, in all the cases except one where the courts found incorporation by reference, the referring

language made clear that the parties intended for the outside material to become part of the contract.[4]

In *In re International Profit Associates, Inc.*, 286 S.W.3d 921 (Tex. 2009) (orig. proceeding) (per curiam), the forum-selection clause the defendant sought to enforce was contained on the first page of the parties' agreement, which was missing from the copy the plaintiff signed. *Id.* at 923. The court held the plaintiff should have realized a page of the contract was missing because he signed pages stating "2 of 4," "3 of 4," and "4 of 4" and a clause on one of the pages he signed stated, "This document, *4 pages in total*, constitutes the entire agreement for services . . . ." *Id.* This language clearly indicated there was a page "1 of 4" missing from the plaintiff's copy of the contract that was intended to be part of the contract.

In *In re Boulder Crossroads, LLC*, 2012 WL 1066482 (Bankr. W.D. Tex. Mar. 28, 2012), the parties' first agreement had attached to it a document titled, "April 2001 Terms and Conditions," which contained a limitation-of-liability provision. *Id.* at *1. The second agreement may not have had the "April 2001 Terms and Conditions" attached, but the last paragraph of the second agreement stated, "Terms and Conditions dated April 2001 (see attached) are hereby incorporated into and made part of this Work Authorization." *Id.* at *2. The court concluded that the "April 2001 Terms and Conditions" were incorporated by reference into the second agreement. *Id.* at *8. The incorporating language in that case made clear that the "April 2001 Terms and Conditions" were intended to become part of the second agreement.

*Owen v. Hendricks*, 433 S.W.2d 164 (Tex. 1968), involved two letters that did not refer to each other but involved the same transaction. *Id.* at 165–67. The Texas Supreme Court concluded that the letters did not incorporate one another by reference. *Id.* at 167. The court

---

[4] The exception was *Westland Oil Development Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 908 (Tex. 1982), which concerned notice of documents referred to in the chain of title, and it is not relevant under the facts of this case.

stated, "It is uniformly held that an unsigned paper may be incorporated by reference in the paper signed by the person sought to be charged. The language used is not important provided the document signed by the defendant plainly refers to another writing." *Id.* at 166. Because the documents did not reference each other, the court did not have before it whether the signed contract must show the parties intended for the referenced document to become part of the contract.

*In re Prudential Insurance Co. of America*, 148 S.W.3d 124 (Tex. 2004) (orig. proceeding), involved incorporation of terms in a lease into a signed personal guaranty of the lease. The lease, which was between a corporate landlord and limited-partnership tenant, stated that in the event of litigation, the parties to the lease waived their right to a jury trial. *Id.* at 127–28. The principals of the tenant's limited partner also signed a personal guaranty stating they promised "to 'faithfully perform and fulfill all of [the] terms, covenants, conditions, provisions, and agreements' of the lease in the event of the partnership's default." *Id.* at 135. The supreme court concluded this language incorporated the terms of the lease, including the jury waiver, into the guaranty agreement because the guaranty plainly referred to the lease's terms and because "documents executed at the same time, with the same purpose, and as part of the same transaction, are construed together." *Id.* The language in the guaranty incorporating by reference the terms of the lease made clear that the parties intended for all the agreements in the lease to become binding on the guarantors when the partnership defaulted.

In *Gray & Co. Realtors, Inc. v. Atlantic Housing Foundation, Inc.*, 228 S.W.3d 431 (Tex. App.—Dallas 2007, no pet.), a seller and purchaser of real estate entered into a real estate contract. *Id.* at 432. In a separate written agreement, the purchaser promised to pay a commission to a broker if the transaction was closed or consummated. *Id.* at 432–33. Nominal title was passed to the purchaser for tax purposes, but the purchaser never paid the purchase

price, and it later returned the title to the seller. *Id.* at 433. The broker sued for its commission, and one of the issues was whether the terms of the real estate contract were incorporated by reference into the broker's representation agreement. *Id.* This Court concluded the real estate contract was incorporated by reference because it was mentioned six times in the representation agreement and because the representation agreement had no purpose without the real estate contract. *Id.* at 436. Thus, the parties did not merely mention the real estate contract but intended for its terms to be included in the representation agreement.

*Castroville Airport, Inc. v. City of Castroville*, 974 S.W.2d 207 (Tex. App.—San Antonio 1998, no pet.), involved a dispute over a city's lease of an airport. The parties entered into a settlement memorandum, and the city drafted a new lease. *Id.* at 209. The lessee rejected the new lease, and the city sued the lessee for breach of the settlement memorandum and the original lease. *Id.* The lessee argued the settlement memorandum was not sufficiently definite to be enforceable. *Id.* at 211. The court of appeals set forth the required elements for an enforceable lease and observed that these terms were contained in Exhibit A and Exhibit B of the settlement memorandum. *Id.* at 212. The lessee asserted that the exhibits were not attached to the settlement memorandum, but the court of appeals concluded they were incorporated by reference. The court stated,

> Contracting parties are obligated to protect themselves by reading what they sign and are presumed, as a matter of law, to know the contract's terms.
>
> The Settlement Memorandum plainly referred to the description of the leased premises on the attached Exhibit A and the sample FBO lease agreement as Exhibit B. Under the doctrine of incorporation by reference, the property description and the sample FBO lease became a part of the Settlement Memorandum. Therefore, [lessee and its guarantor] were obligated to protect themselves by reading the exhibits and are presumed to know their terms.

*Id.* at 211–12 (citations omitted). The court then set forth the requirements for an enforceable lease and stated, "The Settlement Memorandum contains each of these terms." *Id.* at 212.

Although the court did not quote the language referring to the exhibits, the court's description of the language shows the parties intended for the exhibits to become part of their contract.

Dent Zone also cited *Westland Oil Development Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903 (Tex. 1982). Dent Zone quotes the opinion in its brief as stating, "'any description, recital of fact, or reference to other documents puts the purchaser upon inquiry, and he is bound to follow up this inquiry, step by step, from one discovery to another and from one instrument to another,' until he obtains 'complete knowledge' of all of the matters referred to." (Quoting *Westland*, 637 S.W.2d at 908.) That case involved title to oil and gas leases and whether one party was put on notice of another party's equitable title from a reference to a letter agreement contained in an operating agreement that was part of the party's chain of title. The supreme court stated that in matters of chain of title, "[i]t is well settled that 'a purchaser is bound by *every* recital, reference and reservation contained in or fairly disclosed by any instrument which forms an essential link in the chain of title under which he claims.'" *Id.* at 908 (quoting *Wessels v. Rio Bravo Oil Co.*, 250 S.W.2d 668, 670 (Tex. Civ. App.—Eastland 1952, writ ref'd)). The court then set forth the language quoted by Dent Zone.[5] The court concluded that because the party had the duty to investigate the operating agreement, it was charged with notice of the contents of the operating agreement. *Id.* And, because the operating agreement made a clear reference to the letter agreement, the party had the duty to inspect that document. *Id.* This level of notice and incorporation goes beyond that of incorporation by reference in contracts. Because this case does not involve documents in a chain of title to real estate, *Westland Oil* is not relevant.

---

[5] The court stated,

> The rationale of the rule is that *any* description, recital of fact, or reference to other documents puts the purchaser upon inquiry, and he is bound to follow up this inquiry, step by step, from one discovery to another and from one instrument to another, until the whole series of title deeds is exhausted and a complete knowledge of *all the matters referred* to and affecting the estate is obtained.

*Westland Oil*, 637 S.W.2d at 908 (quoting *Loomis v. Cobb*, 159 S.W. 305, 307 (Tex. Civ. App.—El Paso 1913, writ ref'd)).

–15–

The parties cite one case involving incorporation by reference of terms and conditions found on an internet site, *One Beacon Insurance Co. v. Crowley Marine Services, Inc.*, 648 F.3d 258 (5th Cir. 2011).[6] *One Beacon* involved maritime law, not Texas law, but purported to apply general contract principles. *Id.* at 267. In that case, a contractor was repairing a barge owned by Crowley Marine Services when one of the contractor's employees was injured. *Id.* at 261. The employee sued Crowley and the contractor. *Id.* Crowley sought indemnity from the contractor and its insurance company based on the terms and conditions incorporated by reference into Crowley's repair service order that were listed on a website. The referring language in that case stated, in all capital letters, "THIS RSO [repair service order] IS ISSUED IN ACCORDANCE WITH THE PURCHASE ORDER TERMS & CONDITIONS ON WWW.CROWLEY.COM / DOCUMENTS & FORMS, UNLESS OTHERWISE AGREED TO IN WRITING." *Id.* at 263. This language made clear the parties' intent to incorporate the terms and conditions on the website into their agreement.

We conclude the referring language in this case, "Additional benefits, qualifications and details of the PDR LINX Service Program are available for your review at our website: http://www.linxmanager.com/pdf/CRCTermsConditions.pdf," does not indicate the parties intended to incorporate the internet document. Instead, the language indicates the internet document contained informative but noncontractual material about the PDR LINX Service Program.

---

[6] No Texas court appears to have addressed incorporation by reference into a contract of material at a website. However, as the Fifth Circuit stated,

> We see no reason to differ from these principles [of incorporation by reference] where, as here, the terms to be incorporated are contained on a party's website. We note that contracts formed in whole or in part over the internet present relatively new considerations for the courts, and will continue to challenge the courts as the internet plays an increasingly important role in commerce. However, "[w]hile new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract."

*One Beacon*, 648 F.3d at 268 (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2nd Cir. 2004)).

–16–

Dent Zone also asserts incorporation by reference occurred through Geise's telling Rich before he signed the application that the website contained terms and conditions applicable to the program. The trial court made findings of fact and conclusions of law in support of this incorporation theory. However, when a contract is unambiguous, we determine the parties' intent from the terms of the written contract, not from parol evidence. *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) ("An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports."). In this case, the language referring to the internet document does not show any intent by the parties that the internet document would become part of their written contract. There is no ambiguity concerning the parties' intent to incorporate the internet document, and we do not consider any parol evidence. We conclude the trial court erred by determining the internet document was incorporated by reference into the parties' contract.

*Ratification*

Montgomery challenged the sufficiency of the evidence supporting the trial court's findings of fact and conclusions of law that Montgomery ratified the terms and conditions of the internet document. The trial court found and concluded:

> [Finding of Fact] 1.22 Bob Montgomery Chevrolet accepted the benefits of the contract, and continued to accept the benefits of services and profit, after admitting knowledge that the terms and conditions set forth in Plaintiff's Exhibit 2 [the internet document] applied to the contract.
>
> . . . .
>
> [Finding of Fact] 1.25 After Defendant admitted knowing about the terms and conditions, Defendant requested that Plaintiff continue its work in progress to completion, which was a benefit to Defendant, and Defendant kept all the proceeds (not just the 25%) of the work performed by Plaintiff after this admission.
>
> . . . .

–17–

[Conclusion of Law] 2.19 Defendant ratified the contract, including the terms and conditions, by continuing to accept and insist on performance after admitting knowledge of all terms and conditions, and keeping and retaining the benefits of such performance, including the amounts that were due and payable to Plaintiff.

The challenged findings and conclusion are based on Montgomery's admitting knowledge of all the terms and conditions and admitting they applied to the contract. There is no evidence that Montgomery admitted knowledge of the terms and conditions in the internet document or that Montgomery admitted those terms and conditions applied to the contract. Instead, the evidence shows Montgomery never agreed that the internet document was part of the contract, and no evidence shows Montgomery had knowledge of the terms and conditions.

Geise testified that when Rich told him Dent Zone would have to leave, Geise told Rich they had a contract and that Rich should be prepared for someone to contact him about the contract. Geise testified about what happened next:

Q. And what did he say in response to that?

A. He kind of laughed. And he said, first of all, I wouldn't hold anything against you, he said, but I have signed many contracts in my life, and this is merely an agreement, basically this—this—

Q. You can use the word—

A. —crap. . . . I said, sir, I don't understand why you would say that. I explained our process to you very clearly. Our terms and conditions I think are very clearly marked in the middle of our page underlined. We're not trying to hide it.

He made the comment, Judge, that any time you sign something that has this small print and makes me go somewhere else, I—that's crap. He said, I've signed many of these. This is merely an agreement. You go ahead and tell the powers that be that if they need to contact me, feel free to contact me. . . .

Q. In other words, he admitted he saw the reference in the middle of the page because you weren't sitting there analyzing it? [sic]

A. Correct. Correct.

Q. He knew—he referenced—he said he knew he'd seen it?

A. And it was—and it was reviewed by himself and Mr. Montgomery overnight on the 30th as well, so they had time to look at the link, print the link, whatever

they may need to do. So I try to make this as very clear there's nothing—we're not hiding anything. We actually have terms and conditions written right there in the—in the link. So it's not—he did—yes, he did.

Q. Did he say that he had seen it but not read it—

A. He—

Q. —seen the provision in the contract?

A. —he said whenever you put small print like this and make me go to a website, you know, to see something, it's crap. So that's acknowledgment to me that he saw the terms and conditions link. Whether or not he said I went there, I—I can't—I can't say that he—he said he personally went there. I know that it was reviewed.

Q. Okay. And then—so you specifically discussed these provisions, and yet he allowed you to continue working over the weekend, right?

A. Of course, yes.

This testimony shows Rich admitted being aware of the website address printed on the application he signed, but the testimony does not contain evidence that Rich admitted knowledge of the actual terms and conditions or that he admitted the terms and conditions listed on the website applied to their agreement. Instead, the record shows Geise did not know whether Rich or anyone else at Montgomery ever looked at the internet document, and Geise's testimony shows Rich rejected Geise's statement that the terms and conditions in the internet document were part of their agreement. We conclude that no evidence supports the trial court's findings and conclusions that Montgomery admitted knowledge of the terms and conditions on the website and that the dealership admitted those terms and conditions applied to the contract.

We next consider whether the record supports the trial court's conclusion of law that Montgomery ratified the terms and conditions in the internet document by accepting the benefits of the contract after Geise told Rich that the internet document applied to the contract. We conclude no ratification occurred.

Ratification is the adoption or confirmation, by one with knowledge of all material facts, of a prior act that did not then legally bind that person and which that person had a right to repudiate. *Thomson Oil Royalty, LLC v.* Graham, 351 S.W.3d 162, 165 (Tex. App.—Tyler 2011, no pet.). Ratification of a contract occurs when a party recognizes the validity of a contract by acting under, performing under it, or affirmatively acknowledging it. *Barrand, Inc. v. Whataburger, Inc.*, 214 S.W.3d 122, 146 (Tex. App.—Corpus Christi 2006, pet. denied); *Mo. Pac. Ry. Co. v. Lely Dev. Corp.*, 86 S.W.3d 787, 792 (Tex. App.—Austin 2002, pet. dism'd). In other words, a party ratifies a contract by conduct recognizing the contract as valid with knowledge of all relevant facts. *Barrand*, 214 S.W.3d at 146. Any act inconsistent with an intent to avoid a contract has the effect of ratifying the contract. *Id.*; *Barker v. Roelke*, 105 S.W.3d 75, 85 (Tex. App.—Eastland 2003, pet. denied). Whether a party has ratified a contract may be determined as a matter of law if the evidence is not controverted or is incontrovertible. *Barrand*, 214 S.W.3d at 146; *Barker*, 105 S.W.3d at 85.

The doctrine of ratification is not applicable in this appeal. Montgomery does not dispute on appeal that the parties had a legally binding contract or argue that any contract was voidable.[7] *See Thomson Oil Royalty*, 351 S.W.3d at 165. Instead, the issue is whether the internet document was part of the contract. As discussed above, the internet document was not incorporated by reference. We conclude the doctrine of ratification does not apply.[8] *See Barrand*, 214 S.W.3d at 146.

---

[7] In the trial court, Montgomery argued there was no contract because Rich lacked authority to sign contracts on behalf of Montgomery and because Rich thought he was signing a credit application, not a contract. The trial court found Montgomery's evidence on these matters was not credible and found Rich had authority to sign the application at the time he signed it. Montgomery does not challenge these findings in this appeal.

[8] The court of appeals stated in *Barrand, Inc.*:

There is no dispute in this case regarding the validity of the Settlement Agreement and the Modified Franchise Agreement, the only contracts at issue between Whataburger and BurgerWorks. Although Whataburger has maintained that the Settlement Agreement is terminable at-will, we do not view that argument as casting a cloud on the validity of the contract. To the contrary, Whataburger's position recognizes the existence of a valid contract and then suggests that the contract may be terminated at-will. This, in our view, is different from a claim that there is no contract or that the contract relied

*Estoppel*

The trial court entered conclusions of law that Montgomery was estopped, quasi-estopped, and equitably estopped from denying applicability of the terms and conditions of the internet document to the parties contract:[9]

> 2.15 Defendant is estopped to deny the existence of the contract (Plaintiff's Exhibit 1 [the one page application] and 2 [the internet document]) by accepting and retaining the benefits of the contract after obtaining knowledge of all of the terms.
>
> 2.16 Defendant is estopped from claiming that the terms and conditions of Plaintiff's Exhibit 2 are not binding on Defendant because Defendant accepted and retained the benefits of the contract after acquiring knowledge that the terms and conditions in Plaintiff's Exhibit 2 were part of the Program that Defendant joined.
>
> 2.17 Defendant is quasi estopped from claiming that the terms and conditions of Plaintiff's Exhibit 2 are not binding on Defendant because Defendant accepted and retained the benefits of the contract after acquiring knowledge that the terms and conditions in Plaintiff's Exhibit 2 were part of the Program that Defendant joined.
>
> 2.18 Defendant is equitably estopped from claiming that the terms and conditions of Plaintiff's Exhibit 2 are not binding on Defendant because Defendant accepted and retained the benefits of the contract after acquiring knowledge that the terms and conditions in Plaintiff's Exhibit 2 were part of the Program that Defendant joined.

All of these conclusions are based on the court's findings that the terms and conditions in the internet document were terms of the parties' contract and that Montgomery agreed that the terms in the internet document were part of the contract. As discussed above, the contents of the internet document did not become part of the parties' agreement because the document was not

---

upon is invalid. In fact, Whataburger's entire suit for declaratory judgment is, in essence, a request for the trial court to review the parties' written agreements and to declare their respective rights and obligations under those agreements, not to declare them invalid. Accordingly, there is no reason for us to conclude, as urged by BurgerWorks, that the affirmative defense of ratification presents fact issues precluding summary judgment for Whataburger.

*Barrand, Inc.*, 214 S.W.3d at 146 (citation omitted).

[9] On appeal, Dent Zone asserts, "There is no challenge to the finding that BMC [Montgomery] is estopped to deny that the Terms and Conditions were incorporated into the contract." Dent Zone does not identify which of the court's findings of fact found Montgomery was estopped. None of the findings of fact mention "estoppel." On appeal, Montgomery challenges all of the trial court's conclusions of law that Montgomery was estopped.

signed by Montgomery, the document was not incorporated by reference, and no evidence supports a finding that Montgomery agreed that the contents of the internet document were part of the parties' agreement.[10] Because the factual findings supporting the court's conclusions of law concerning estoppel are not supported by any evidence, those conclusions are erroneous as a matter of law. *See Wright Group Architects-Planners, P.L.L.C. v. Pierce*, 343 S.W.3d 196, 205 (Tex. App.—Dallas 2011, no pet.).

## CONCLUSION

Having determined (1) the internet document was not incorporated by reference into the parties' contract, (2) Montgomery did not ratify the internet document, and (3) the evidence does not support the trial court's conclusions of law that Montgomery was estopped from denying the terms and conditions in the internet document applied to the contract, we conclude the forum-selection clause was not a part of the parties' contract. Accordingly, the trial court erred by concluding Montgomery consented to jurisdiction in Texas. We sustain Montgomery's first four issues.[11]

We reverse the trial court's order denying Montgomery's special appearance, and we render judgment granting the special appearance and dismissing the cause for want of personal jurisdiction.

130197F.P05

/Lana Myers/
LANA MYERS
JUSTICE

---

[10] In its appellee's brief, Dent Zone asserts that Montgomery did not challenge "the finding that BMC [Montgomery] is estopped to deny that the Terms and Conditions were incorporated into the contract." The court's findings of fact do not mention "estoppel," and the court's conclusions of law about estoppel do not mention incorporation of the internet document into the parties' contract by reference.

[11] Because of our disposition of the first four issues, we do not reach Montgomery's fifth issue asserting the evidence was legally and factually insufficient to support the trial court's finding and conclusion that the forum-selection clause was not the result of overreaching by Dent Zone.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

BOB MONTGOMERY CHEVROLET,
INC. D/B/A BOB MONTGOMERY
COLLISION, Appellant

No. 05-13-00197-CV        V.

DENT ZONE COMPANIES, Appellee

On Appeal from the 95th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-12-06337-D.
Opinion delivered by Justice Myers.
Justices Moseley and Fillmore participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and we **RENDER** judgment granting appellant BOB MONTGOMERY CHEVROLET, INC. D/B/A BOB MONTGOMERY COLLISION's special appearance and dismissing the cause for want of personal jurisdiction.

It is **ORDERED** that appellant BOB MONTGOMERY CHEVROLET, INC. D/B/A BOB MONTGOMERY COLLISION recover its costs of this appeal from appellee DENT ZONE COMPANIES.

Judgment entered this 5th day of August, 2013.

/Lana Myers/
LANA MYERS
JUSTICE