

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-15-00390-CV

COMPASS BANK                                                          APPELLANT

V.

JERRY DURANT                                                          APPELLEE

----------

FROM THE 43RD DISTRICT COURT OF PARKER COUNTY
TRIAL COURT NO. CV13-0933

----------

## OPINION

----------

## I. Introduction

In four issues, Appellant Compass Bank appeals the trial court's summary judgment for Appellee Jerry Durant in a dispute over (1) the interpretation of early termination fee provisions contained in certain documents, including an interest rate swap agreement, that were executed by the parties in conjunction with a

commercial loan agreement and (2) the award of attorney's fees to Durant.  We reverse and remand.

## II.  Factual and Procedural Background

In 2008, Durant and Jeff Williams, a loan officer for Compass, entered into negotiations for a loan related to an automobile dealership that Durant was opening in Granbury.  In the course of those negotiations, Durant signed both a "swap agreement" and a note.

### A.  Swap Agreements

To assist in understanding the facts of this case and the issues presented on appeal, we provide a brief background on "swaps"—interest rate swaps, in particular, including their purpose and structure.

A financial swap is exactly what the name implies.  It is a tool borrowed from age-old bartering practices that has been adapted for use in modern-day commercial transactions.  At its fundamental core, it allows two parties, both of whom possess something that they do not want, but each wanting something that the other has, to trade their commodities.  The swap allows a party to receive exactly what it wants, but otherwise would not have.

Although bartering, or swapping, has been around for centuries, swaps did not surface into financial markets until the late 1970s.[1]  They attracted national

---

[1]Frederic Lau, Derivatives in Plain Words 25 (1st ed. 1997); U.S. Securities and Exchange Commission, *Derivatives*, *available at* https://www.sec.gov/spotlight/dodd-frank/derivatives.shtml (last visited Jan. 3, 2017).

attention in the wake of the home mortgage crisis of 2008, and served as part of the impetus for the Dodd–Frank Act of 2010 which, for regulatory purposes, expanded the definition of a security to include security-based swap agreements, 15 U.S.C.A § 78c (West Supp. 2016), and identified other types of swaps as commodities.  7 U.S.C.A. § 1a (West Supp. 2016).  Today, swaps are defined as a type of "alternative trading system" and are highly regulated, with the Commodity Futures Trading Commission (CFTC) serving as the primary oversight agency providing for non-security-based swap transactions.  *Id.*  In discharge of its duty to periodically report trading activity in the swaps market, the CFTC publishes an online Weekly Swaps Report, which reports trillions of dollars in swap activity in the U.S. in any given week.  *See id.* § 2(a)(14).[2]

A financial swap is used in the marketplace as a type of derivative[3] designed to reduce risk.  Generally speaking, it manifests itself in a contract between two parties whereby both parties promise to make payments to each other.  Lau, *supra* note 1, at 40.  In a basic interest rate swap,[4] two parties trade

---

[2]*See also Weekly Swaps Report, available at* http://www.cftc.gov/MarketReports/SwapsReports/index.htm (last visited Jan. 3, 2017).

[3]A derivative is a financial instrument that derives its value from a more basic financial instrument.  Henry N. Butler, Economic Analysis for Lawyers 918 (2d ed. 1998).  For example, an option on a stock (a basic form of derivative) derives its value from the underlying stock.  *Id.*  Derivatives can be used to either increase or decrease risk.  *Id.*

[4]Although interest rate swaps—the type of swap at issue here—are the most common, many other types of swaps appear in the marketplace.  *See* 7

3

a fixed-rate and variable-interest rate, agreeing to exchange interest rate payments with one another. By entering into a swap agreement, the parties "hedge" the risk associated with the interest rate provided for in another transaction in which they are involved. As the court in *Thrifty Oil Company v. Bank of America National Trust & Saving Association* explained,

> [O]ne [party agrees] to make payments equal to the interest which would accrue on an agreed hypothetical principal amount ("notional amount"), during a given period, at a specified fixed interest rate. The other [party] must pay an amount equal to the interest which would accrue on the same notional amount, during the same period, but at a floating interest rate. If the fixed rate paid by the first [party] exceeds the floating rate paid by the second [party], then the first [party] must pay an amount equal to the difference between the two rates multiplied by the notional amount, for the specified interval. Conversely, if the floating rate paid by the second [party] exceeds the fixed rate paid by the first [party], the fixed-rate payor receives payment. The agreed hypothetical or "notional" amount provides the basis for calculating payment obligations, but does not change hands.

322 F.3d 1039, 1042–43 (9th Cir. 2003).

Interest rate swapping is beneficial when one borrower can obtain only a fixed-rate interest payment loan but wants a loan with a variable interest rate, while another borrower can obtain only a variable interest rate loan but wants a fixed-rate interest payment instead. The swap agreement allows the parties to

U.S.C.A. § 1a(47) (defining the term "swap" to include interest rate swaps, cross-currency rate swaps, basis swaps, currency swaps, foreign exchange swaps, total return swaps, equity index swaps, equity swaps, debt index swaps, debt swaps, credit default swaps, credit swaps, weather swaps, energy swaps, metal swaps, agricultural swaps, emission swaps, and commodity swaps). But swaps can also be tailor-made to "almost anything according to the customers' needs." Lau, *supra* note 1, at 40.

4

swap interest payments with one another, so that each one receives the advantage—or the disadvantage—of the rate it actually wanted, rather than the one it received from its lender.

For example, assume ABC Company wants to borrow $100,000 on a two-year note, but—not wanting to risk that interest rates would rise during the two-year period, yet willing to forego the benefit of interest rates falling during that same time period—seeks a 10% fixed interest note. The bank, however, will not agree to a fixed interest note, but instead offers ABC a floating interest rate equal to the London Interbank Offered Rate (LIBOR).[5] XYZ Company also seeks a $100,000 loan for a two-year term, except that XYZ—who is willing to risk that interest rates will rise for the opportunity to reap the potential benefits of an interest rate decline during the two-year period—seeks a floating interest note. XYZ's lender, however, offers only a 10% fixed interest rate loan. So, ABC and XYZ enter into an interest rate swap agreement as follows: (1) ABC agrees to pay a 10% fixed interest rate payment on a $100,000 "notional amount"[6] to XYZ

---

[5]LIBOR is the interest rate that international banks with high-quality credit ratings charge each other for loans. Butler, *supra* note 3, at 822. It is also the rate that was used in the swap agreement at issue here.

[6]The notional amount used in a swap agreement is not traded. *Thrifty Oil Co.*, 322 F.3d at 1043.

5

each year for two years; (2) XYZ agrees to pay the LIBOR rate on the $100,000

notional amount each year for two years to ABC.[7]

In this example, at the end of the first year, LIBOR is at 9%. The net

result—after offsetting the amounts owed by each to the other—is that ABC owes

XYZ a payment of $1,000,[8] an amount representing the fluctuation in the interest

rate that occurred during the payment period (1% of $100,000). At the end of the

second year, LIBOR is at 12%. This time, after offsetting the amounts due by

both parties under the terms of the swap agreement, XYZ owes a net amount of

$2,000 to ABC,[9] again, an amount representing the fluctuation in the interest rate

that occurred during the payment period (2% of $100,000). *See generally Thrifty

Oil Co.*, 322 F.3d at 1043; Butler, *supra* note 3, at 822.

This transaction is illustrated below:

---

[7]Finding counterparties with identical offsetting needs complicates matters. The use of derivatives dealers, however, solves the problem. Derivatives dealers hedge their risks by entering into different types of swaps with numerous counterparties and with diversity of risk, as well as through the use of futures and options. Butler, *supra* note 3, at 823–24.

[8]Pursuant to the terms of the swap agreement, ABC owes $10,000 to XYZ. XYZ, in turn, owes $9,000 to ABC. Thus, the net amount due is $1,000, owed by ABC to XYZ.

[9]ABC owes $10,000 to XYZ. XYZ owes $12,000 to ABC. Thus, the net amount due is $2,000, payable by XYZ to ABC.

## ABC Co.

Wanted a 10% fixed rate on $100,000 for two years
Received a LIBOR rate on $100,000 for two years

| | Interest Actually Owed to Lender at LIBOR rate *(What ABC Got)* | Interest That Would Have Been Owed to Lender at Fixed Rate *(What ABC Wanted)* | Amount ABC Paid To XYZ Under Swap Agreement | Amount ABC Received From XYZ Under Swap Agreement | Net Amount Paid or Received Under Swap Agreement |
|---|---|---|---|---|---|
| Year 1 - 9% | $9,000 | $10,000 | $10,000 | $9,000 | **$1,000** (paid) |
| Year 2 - 12% | $12,000 | $10,000 | $10,000 | $12,000 | **$2,000** (rec'd) |
| **TOTAL** | **$21,000** | **$20,000** | $20,000 | $21,000 | **$1,000** (rec'd) |

**SUMMARY**

| | |
|---|---|
| $21,000 | Total Interest ABC Paid to Lender (Floating Interest Note) |
| -20,000 | Total Interest ABC Wanted to Pay to Lender (Fixed Interest Note) |
| -1,000 | Additional Amount Received from XYZ Under Swap Agreement |
| $ -0- | Difference Between What ABC Wanted & What ABC Received (Using Swap Agreement) |

*Conclusion: By use of Swap Agreement, ABC received exactly what it wanted.*

## XYZ Co.

Wanted a LIBOR rate on $100,000 for two years
Received a 10% fixed rate on $100,000 for two years

| | Interest Actually Owed to Lender at Fixed rate *(What XYZ Got)* | Interest That Would Have Been Owed to Lender at Floating Rate *(What XYZ Wanted)* | Amount XYZ Paid To ABC Under Swap Agreement | Amount XYZ Received From ABC Under Swap Agreement | Net Amount Paid or Received Under Swap Agreement |
|---|---|---|---|---|---|
| Year 1 - 9% | $10,000 | $9,000 | $9,000 | $10,000 | **$1,000** (rec'd) |
| Year 2 - 12% | $10,000 | $12,000 | $12,000 | $10,000 | **$2,000** (paid) |
| **TOTAL** | **$20,000** | **$21,000** | $21,000 | $20,000 | **$1,000** (paid) |

**SUMMARY**

| | |
|---|---|
| $21,000 | Total Interest XYZ Wanted to Pay to Lender (Floating Interest Note) |
| -20,000 | Total Interest XYZ Paid to Lender (Fixed Interest Note) |
| -1,000 | Additional Amount Paid to ABC Under Swap Agreement |
| $ -0- | Difference Between What XYZ Wanted & What XYZ Received (Using Swap Agreement) |

*Conclusion: By use of Swap Agreement, XYZ received exactly what it wanted.*

As the illustration shows, by its very design, a swap is a "hedge,"[10] or a zero-sum game. What a party loses in the transaction with the lender, it gains in the swap transaction, and vice-versa. The same is true vis-à-vis the parties in the swap deal—one party's loss will always be equal to the other party's gain.[11]

As it turns out, in the example above, XYZ ended up paying $1,000 more than it would have if it had simply accepted the terms as offered by its lender.[12] But XYZ lost only that which it would have lost anyway, had it received what it wanted in the first place.

A swap transaction could also be characterized as a win-win game. If the measure of success is whether a party gets exactly what it wants, then the swap yielded a 100% success rate for both ABC and XYZ. The bottom line is that a swap agreement guarantees that each party will receive the benefit of the bargain it wanted, but was unable to make, with its lender.[13]

---

[10]"Hedging" is the making of simultaneous contracts to purchase and to sell a particular commodity at a future date with the intention that the loss on one transaction will be offset by the gain on the other. Butler, *supra* note 3, at 921.

[11]Only if the floating interest rate remained at the fixed rate throughout the duration of an interest rate swap would the result end in a draw. Under that scenario, neither party would owe the other any money in the deal.

[12]Here, Durant found himself in a similar position because interest rates fell during the duration of the note. He admitted that had he not hedged against the LIBOR rate offered by Compass and swapped his floating interest rate for a fixed interest rate, he would have paid less interest overall.

[13]XYZ—who wanted a floating interest rate but received a fixed interest rate—received the benefit of a floating interest rate loan by virtue of the $1,000 payment from ABC when interest rates fell 1% in the first year. But in the second

## B. The Compass-Durant Swap Agreement and Note

During the financial negotiations, Durant expressed to Compass his desire to borrow $6 million at a fixed-interest rate for a term of 15 years. In addition, Durant told Williams that he wanted to be able to prepay the loan without any termination fee or penalty. To secure the benefits of the fixed-interest rate that Durant wanted under the floating interest note he ultimately received, Compass and Durant entered into a 15-year interest rate swap agreement.[14] To hedge its own risk under the swap agreement with Durant, Compass entered into a counter hedge agreement with Wells Fargo with identical terms.

Among other provisions, the swap agreement between Compass and Durant provided for "Payments on Early Termination"—along with measures to calculate the payment amounts that would become due if triggered—in the event Durant defaulted on the swap agreement by paying off the note prior to the

---

year, when interest rates increased by 2%, the swap agreement worked to take $2,000 out of XYZ's pocket, which is exactly the amount XYZ would have owed in interest if XYZ had received the floating interest rate note it sought instead of the fixed-rate note it received.

On the other hand, in the first year ABC—who wanted a fixed interest rate but instead received a floating interest rate—had to forego the benefits it received under the LIBOR note it did not want. However, in the second year, when LIBOR rose to 12%, ABC was able to recoup the money it was required to pay to its lender but would not have otherwise owed if it had received the fixed-rate note it sought in the first place.

[14]The parties signed an "ISDA Master Agreement," a "Schedule" to that Master Agreement, and a "Confirmation Letter," hereafter collectively referred to as "the swap agreement" or "the hedge agreement."

expiration of the swap agreement. Although Durant testified that he never read the document, the summary judgment evidence shows that a "Risk Disclosure" warning that "should you liquidate the swap contract prior to maturity, you may realize a significant financial gain or a loss" was included as Exhibit B to the ISDA Master Agreement.

After the swap agreement had been executed, the attorney for Compass sent the remaining loan documents to Durant's attorney, who noticed that the note did not include a right to prepay without penalty. After additional negotiations, the parties agreed to the following three-year prepayment penalty provision in the note that was ultimately signed by Durant on May 2, 2008:

> **1. Prepayments**. [Durant] shall be entitled to prepay the unpaid principal balance hereof, from time to time and at any time, in whole or in part; however, in the event that [Durant] prepays the original principal balance hereof, then [Durant] shall also at that time pay to [Compass] a prepayment penalty (the "Penalty Amount"). The Penalty Amount shall be equal to (a) three percent (3%) of the then outstanding balance hereunder if the prepayment occurs on or before June 1, 2009; (b) two percent (2%) of the then outstanding balance hereunder if the prepayment occurs after June 1, 2009 but on or before June 1, 2010; and (c) one percent (1%) of the then outstanding balance hereunder if the prepayment occurs after June 1, 2010 but on or before June 1, 2011.

The note provided for interest at the LIBOR rate for the 15-year term, but it also contained a provision acknowledging the existence—and obligations—of the swap agreement that had been previously executed by the parties:

> **18. Hedge Agreement.** [Durant] acknowledges and agrees that this note evidences [Durant's] obligation to pay to the order of [Compass] any and all amounts advanced from time to time under the Loan Agreement, together with interest on the unpaid principal

10

balance from time to time outstanding hereunder. [*Durant's*] *obligations hereunder and under the Loan Agreement shall also be deemed to include all other obligations incurred by* [*Durant*] *under any agreement between* [*Durant*] *and* [*Compass*] *or any affiliate of* [*Compass*]*, including but not limited to an ISDA Master Agreement*, whether now existing or hereafter executed, which provides for an interest rate, currency, equity, credit or commodity swap, cap, floor or collar, spot or foreign currency exchange transaction, cross currency rate swap, currency option, any combination of, or option with respect to, any of the foregoing or similar transactions, for the purpose of hedging [Durant's] exposure to fluctuations in interest rates, exchange rates, currency, stock, portfolio or loan valuations or commodity prices (each a "Hedge Agreement"). [Emphasis added.]

Three years later, Durant decided to prepay his loan and terminate the entire transaction. At that point, Compass informed Durant that while no prepayment penalty amount was due under paragraph 1 of the note, by paying off the note prior to maturity, Durant would still be obligated—under the terms of the swap agreement—to pay a termination fee of approximately $1 million to obtain a release of the lien on the loan collateral.[15]

Durant disputed that he owed any termination fee, and in June 2013, he filed suit for breach of contract and for a declaratory judgment of non-liability, i.e., that he was not obligated to make an early termination payment if he paid off his loan after three years. However, in order to receive the release of the lien on the loan collateral during the pendency of the lawsuit, on August 28, 2013, Durant

---

[15]Compass argued at the summary judgment hearing and on appeal that the termination fee that Compass demanded was equivalent to the liability that Compass incurred on its counter hedge agreement with Wells Fargo.

paid—"under protest"—the $790,350 termination fee assessed by Compass, along with the $5,108,343.81 balance due on the note.

The parties filed competing motions for summary judgment in a piecemeal fashion, and the trial court ruled on the various motions during the course of litigation.[16] On June 6, 2014, the trial court signed an order granting Durant's motion for partial summary judgment for declaratory judgment that "Jerry Durant had the right to prepay the amount owed under the Promissory Note without payment of any penalty, including any fee allegedly owed under the Master Agreement, Schedule, and Confirmation." On October 23, 2014, the trial court denied Compass's traditional motion for summary judgment in its entirety. By order dated August 25, 2015, the trial court granted "in all respects" Durant's second motion for partial summary judgment seeking damages, but the order did not specify the amount of damages awarded.

In November, the trial court signed a final judgment, which incorporated the June 6, 2014 and August 25, 2015 orders and recited

> Accordingly, it is hereby ORDERED, ADJUDGED, DECREED and DECLARED that after June 1, 2011 Jerry Durant had the right to prepay the amount owed under the Promissory Note without payment of any penalty or fee, including any fee claimed by Compass under the Master Agreement, Schedule, and Confirmation.
>
> . . . .

---

[16]In its motion, Compass set forth eleven grounds for summary judgment. As will be discussed later, only the first four grounds are at issue in this appeal.

It is therefore ORDERED, ADJUDGED and DECREED that Jerry Durant have and recover from Compass Bank actual damages in the amount of $790,350.00 and prejudgment interest thereon . . . .

. . . .

It is therefore ORDERED, ADJUDGED and DECREED that Jerry Durant have and recover from Compass Bank reasonable and necessary attorneys' fees in the amount of $157,000.00 for prosecution of his breach of contract claim, or, in the alternative, his declaratory judgment claims . . . .

### III.  Standard of Review

In a summary judgment case, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).  We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).

We take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003).  The summary judgment will be affirmed only if the record establishes that the movant has conclusively proved all essential elements of the movant's cause of action or defense as a matter of law.  *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979).

13

A plaintiff is entitled to summary judgment on a cause of action if it conclusively proves all essential elements of its claim. *See* Tex. R. Civ. P. 166a(a), (c); *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986).

A defendant who conclusively negates at least one essential element of the plaintiff's cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010), *cert. denied*, 562 U.S. 1180 (2011). Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence that raises a fact issue. *Van v. Pena*, 990 S.W.2d 751, 753 (Tex. 1999).

When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both parties' summary judgment evidence and determine all questions presented. *Mann Frankfort*, 289 S.W.3d at 848. The reviewing court should render the judgment that the trial court should have rendered. *See Myrad Props., Inc. v. LaSalle Bank Nat'l Ass'n*, 300 S.W.3d 746, 753 (Tex. 2009); *Mann Frankfort*, 289 S.W.3d at 848.

## IV. Summary Judgment Granted on Durant's Breach of Contract and Declaratory Judgment Actions

In its first three issues, Compass contends that the trial court erred by granting Durant's summary judgment on his breach of contract action against Compass and by declaring that Durant had the right to prepay the amount under

14

the note without the payment of any fee under the swap agreement, arguing that the plain language of the swap agreement and related loan documents obligated Durant to pay the early termination fee. We agree.

Durant argues that the note's three-year prepayment penalty provision and swap agreement's early termination provision are inconsistent with one another and that the note's three-year prepayment penalty provision governs. In his first motion for partial summary judgment, Durant argued,

> [T]he Hedge Agreement, Promissory Note, and Loan Agreement are a part of one transaction and must be interpreted together. . . . [B]ecause the Promissory Note and Loan Agreement were executed *after* execution of the Hedge Agreement, the provisions of the Promissory Note and Loan Agreement control the inconsistency between them and the Hedge Agreement.

Compass, on the other hand, argued that the swap agreement is a stand-alone agreement, completely independent from the Promissory Note.

We need not decide whether the swap agreement and subsequent loan documents are part of one transaction or whether they constitute two separate, stand-alone transactions. As will be discussed below, the note specifically references and incorporates the relevant swap agreement provisions into it, such that the terms in dispute here are provided for by reference in the note itself. Also, even assuming that all documents executed between the parties between March and May 2008 were part of a single transaction, Durant's argument hinges upon the assumption that these documents are inconsistent with one another, and we disagree with that premise.

15

So the question is not whether the agreements Durant signed constitute one transaction or two separate, stand-alone transactions, but rather whether the terms of the note that relate to the consequences of Durant's early pay-off of the loan are ambiguous.  For the reasons explained below, we hold that they are not.

## A.  The Note

Both parties agree that paragraph 1 of the note provides that Durant was entitled to prepay the unpaid principal balance of the note, in whole or in part, at any time.  However, the note stops short of stating that Durant could do so without penalty.  In fact, both sides agree that the note provides that Durant was obligated to pay a "prepayment penalty" or "penalty amount" if the original principal balance was prepaid prior to June 1, 2011.

In other words, while paragraph 1 of the note declared that Durant was "entitled" to prepay unpaid principal balance in whole or in part, it also provided that, depending upon timing—when Durant decided to exercise his entitlement— he would be required to pay a penalty amount calculated by using a defined percentage of the principal balance of the note.  Neither side argues that these two provisions create ambiguity or are in conflict with one another.  Both seem to agree that these two clauses combine to mean that while Durant could prepay the note, such prepayment might subject him to penalty, depending upon the timing of the prepayment.

Likewise, immediately below paragraph 1, paragraph 2 provides that an event of default under the note would include "[a]n '[e]vent of [d]efault' *as such*

16

*term is defined in . . . any* [*h*]*edge* [*a*]*greement* (defined below) involving this note." [Emphasis added.] By signing the note, Durant agreed to the terms of paragraph 2 that further provided that if he defaulted under the swap agreement, Compass had the right to "exercise any and all remedies set forth in . . . any [h]edge [a]greement involving this note." Durant reaffirmed his obligation to abide by the terms of the swap agreement in paragraph 18 of the note, which defined the "hedge agreement" and incorporated all of the obligations under it.[17] *See Bob Montgomery Chevrolet, Inc. v. Dent Zone Co.*, 409 S.W.3d 181, 189 (Tex. App.—Dallas 2013, no pet.) (holding that once a document is incorporated into another by reference it becomes a part of that contract and "both instruments must be read and construed together").

Thus, by executing the note, Durant agreed to two provisions regarding prepayment of the note: Paragraph 1, which required that if he prepaid the unpaid principal balance of the note, he would, depending upon timing, be subject to a prepayment penalty under that paragraph, and Paragraph 2, which required that prepayment would also trigger a default under the swap agreement, further subjecting him to a "Payment[] on Early Termination" provided for in the swap agreement. The provision for two types of penalties that would be

---

[17]Paragraph 18 states that Durant's obligations under the note included "*all other obligations* incurred by [Durant] *under any agreement* between [Durant] and [Compass] . . . *including but not limited to an ISDA Master Agreement, whether now existing or hereafter executed*, which provides for an interest rate . . . swap." [Emphasis added.]

17

triggered in the event of prepayment of the note's unpaid principal balance—one under the note, the other under the swap agreement—does not constitute an inconsistency. And the additional proviso that one, but not both, of the prepayment penalty obligations would cease if the prepayment occurred after June 1, 2011, does not change the equation. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) ("[We] should examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless.").

Durant argues on appeal, as he argued at trial,

> [T]he subsequently negotiated Note specified the only prepayment penalty Durant would be required to make if he prepaid. After June 1, 2011, no prepayment penalty of any kind or amount is specified because there was to be none.[18] Compass knew Durant insisted upon the right to terminate the transaction early without any penalty or fee. Hence, if Compass intended that prepayment of the Note would generate a penalty or termination fee, including one under the Swap, it could easily have expressed that in the "Prepayments" paragraph in the Note.

We acknowledge that the summary judgment record includes evidence that Durant had voiced his desire for the right to terminate the transaction early without any penalty or fee, and that Compass knew that Durant wanted that right. But to glean the meaning of a contract, we must look first to the instrument itself as the written embodiment of the parties' intent, not to the intent of the parties as

---

[18]As mentioned above, the note contained no statement to the effect that the prepayment penalty in paragraph 1 was the "only prepayment penalty Durant would be required to make."

subsequently asserted. *Id.* (stating that when contracts are so worded that they can be given a certain or definite legal meaning or interpretation, then they are not ambiguous, and the court will construe them as a matter of law); *see Lopez v. Muñoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000) (stating that the court will enforce an unambiguous contract "as written.").

And Durant's argument that "[a]fter June 1, 2011, no prepayment penalty of any kind or amount is specified," is not accurate because it overlooks two paragraphs in the note itself. The terms of the swap agreement, which obligated Durant to make certain payments upon early termination of the swap agreement, were incorporated into the note in paragraphs 2(c) and 18.

Likewise, the contention that "if Compass intended that prepayment of the Note would generate a penalty or termination fee . . . under the Swap, it could easily have expressed that in the 'Prepayments' paragraph in the [n]ote," is certainly true. But it ignores the fact that note did express, by reference—not in the "prepayments" paragraph, but in the paragraph that immediately followed entitled "Events of Default and Remedies," and in a later paragraph entitled "Hedge Agreement"—that Durant would be obligated to pay a termination fee under the swap agreement in the event of early termination.[19] *See Bob Montgomery Chevrolet, Inc.*, 409 S.W.3d at 189.

---

[19]Perhaps more significant is what the note does not state. The note does not state that upon prepayment, Durant would owe only the penalty provided for under paragraph 1 and no other. Had such a statement appeared in the note, our analysis regarding ambiguity would have been quite different.

## B. The Swap Agreement

The Schedule to the ISDA Master Agreement provided, in part 1, paragraphs (i) and (j), that prepayment of the note constituted an "Additional Termination Event" and an "Additional Event[] of Default," both of which triggered an obligation for "Payments on Early Termination."[20] Unlike the prepayment penalty calculation in the note, which was based upon a percentage of the principal balance of the note, the "Payments on Early Termination" calculation in the swap agreement is based upon market quotations and the amount of Compass's loss with respect to the swap agreement.

## C. The Note and the Swap Agreement

Reading paragraphs 1, 2, and 18 of the note together, with regard to prepayment of the note, Durant agreed to these essential terms: (1) If Durant prepaid the note within the first three years, he would owe a "prepayment penalty" under the note and a "Payment[] on Early Termination" pursuant to the swap agreement; and (2) If Durant prepaid the note after three years, he would owe no "prepayment penalty," but only a "Payment[] on Early Termination" pursuant to the swap agreement. To construe the note otherwise, as Durant proposes, would require the striking of two full paragraphs—paragraphs 2 and 18—from the note. *See Rutherford v. Randal*, 593 S.W.2d 949, 952–53 (Tex.

---

[20]Compass refers to the payment obligation under this provision in the swap agreement as a "termination fee"; Durant refers to it as a "prepayment penalty." In the ISDA Master Agreement and Schedule, it is referred to as "Payments on Early Termination."

20

1980) (holding that in the absence of ambiguity, courts must not consider extrinsic evidence of intent, but rather limit consideration to the provisions in the written document itself); *Rubinstein v. Lucchese, Inc.*, 497 S.W.3d 615, 625 (Tex. App.—Fort Worth 2016, no pet.) ("We are not permitted to rewrite an agreement to mean something it did not.").

This transaction was negotiated between sophisticated parties who were represented by counsel, who, in turn, actively negotiated changes to the note on the very issue in dispute here. Parties to a contract are masters of their choices and are entitled to select what terms and provisions to include in or omit from a contract. *See Lucchese,* 497 S.W.3d at 625; *Healthcare Cable Sys., Inc. v. Good Shepherd Hosp., Inc.*, 180 S.W.3d 787, 791 (Tex. App.—Tyler 2005, no pet.); *Birnbaum v. Swepi LP*, 48 S.W.3d 254, 257 (Tex. App.—San Antonio 2001, pet. denied). Thus, we presume that the parties to a contract intend every clause to have some effect. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). With those principles in mind, when interpreting a contract, we must examine the entire document and consider each part with every other part, so that the effect and meaning of one part on any other part may be determined. *Id.*

So, while the record may support Durant's contention that during the period of negotiation both parties understood that Durant wanted to include in the agreement the ability—after three years' time—to pay off his note without any penalty, fee, or additional payment of any kind, the plain language of the note— as well as other documents he signed—provided otherwise. And, as explained

21

above, because the note and the swap agreement are not in irreconcilable conflict, but can be read together in harmony, we must deem the unambiguous contract to express the intention of the parties. The law has been thus for more than half a century. *See Woods v. Sims*, 273 S.W.2d 617, 620–21 (Tex. 1954). In *Woods*, the court stated,

> Generally the parties to an instrument intend every clause to have some effect and in some measure to evidence their agreement, and this purpose should not be thwarted except in the plainest case of necessary repugnance. Even where different parts of the instrument appear to be contradictory and inconsistent with each other, the court will, [if] possible, harmonize the parts and construe the instrument in such way that all parts may stand and will not strike down any portion unless there is an irreconcilable conflict wherein one part of the instrument destroys in effect another part.

*Id.*; *see Magee v. Hambleton*, No. 02-08-00441-CV, 2009 WL 2619425, at *3 (Tex. App.—Fort Worth Aug. 25, 2009, pet. denied) (mem. op.) (citing *Woods* to recite that the court attempts harmonization because "the parties to an instrument intend every clause to have some effect"); *see also Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 727–28 (Tex. 1981) (stating that in construing an instrument, the court's task is to seek the parties' intention "as that intention is expressed" in the document).

Moreover, reading the note to embrace the terms and obligations of the swap agreement is a construction consistent with the economic realities of the transaction itself. The supreme court has instructed us that we should construe contracts "from a utilitarian standpoint bearing in mind the particular business activity sought to be served." *Frost Nat'l Bank v. L & F Dist., Ltd.*, 165 S.W.3d

22

310, 312 (Tex. 2005); *see also Cook Composites, Inc. v. Westlake Styrene Corp.*, 15 S.W.3d 124, 132 (Tex. App.—Houston [14th Dist.] 2000, pet. dism'd) (explaining that we should consider "the purposes which the parties intended to accomplish by entering into the contract").

Here, Durant signed a note with a LIBOR interest rate, but because he wanted a fixed rate loan, he entered into a swap agreement for 15 years, the life of his loan. As it turned out, interest rates declined during the life of the loan, and in his deposition, Durant admitted that, in hindsight, he should have entered into the LIBOR interest rate note that Compass offered without a swap agreement to receive fixed interest protection. Nevertheless, from 2008 until 2011, Durant enjoyed the potential benefit of the agreement, i.e., protection against rising interest rates that he would have been contractually obligated to pay by swapping for a fixed interest rate payment instead.

Three years after the agreement was executed between the parties and twelve years' shy of the swap agreement's termination date, Durant attempted to unilaterally walk away from the deal. At that point, Compass was entitled to receive the benefit of the bargain it made by entering into the swap agreement with Durant,[21] the risk of which was hedged through a counter-swap with Wells

---

[21]As the court in *Thrifty Oil* explained,

> A fundamental characteristic of an interest rate swap is that the counterparties never actually loan or advance the notional amount. The swap involves an exchange of periodic payments calculated by reference to interest rates and a hypothetical notional

23

Fargo.[22] The early termination payment, calculated on market quotations to determine the amount of loss, if any, incurred by Compass as a result of the default, was the contractual mechanism[23] that provided compensation for such an occurrence.[24]

amount . . . The amount of net periodic payments exchanged under the swap, and the counterparty entitled to receive them, depend on movements in short term interest rates that have no connection with any underlying loan. *The damages due upon termination of the swap merely provide the replacement cost of the lost swap payments* . . .

322 F.3d at 1048 (emphasis added).

[22]According to the summary judgment evidence in this record, Compass counter-hedged with Wells Fargo so that it would receive the benefit of a LIBOR-rate note after it hedged with Durant for a fixed-rate note. Except for Compass's demand for—and acceptance of—$790,350 from Durant as an early termination payment, the record is silent as to what costs were actually incurred by Compass in undoing its counter-hedge with Wells Fargo. Durant challenged not only the validity of the obligation but also Compass's calculation of the amount of the obligation.

[23]Some swap agreements do not permit the defaulting party to collect termination damages. *Thrifty Oil Co.*, 322 F.3d at 1043.

[24]Whether a party is "in the money" or "out of the money" usually determines whether damages are recoverable in the event of a default or early termination of the agreement because "[m]ost [swap] agreements provide that, in the event of an early termination or default, the party in the money is entitled to collect 'termination damages.'" *Thrifty Oil Co.*, 322 F.3d at 1043. A party to a swap agreement whose position is yielding a positive value under the swap is considered "in the money" while a party with negative value is considered "out of the money." *Id.* The swap agreement between Compass and Durant embraced this method for determining whether Durant would be required to pay Compass an early termination payment.

Ordinarily, termination or default damages represent "the replacement cost of the terminated swap contract." *Id.* Thus, termination damages are typically

Exhibit B to the ISDA Master Agreement Schedule, entitled "Risk Disclosure for Interest Rate Swaps," provided edification to Durant on this point, in basic terms, along with conspicuous warnings as to the potential complexity of a swap agreement:

> An interest rate swap is a legal contract between two parties to exchange a set of cash flows over a specific period of time. In a typical interest rate swap, a party's floating rate payments on a loan are exchanged, or "swapped," for another party's fixed rate payments on a similar loan. Interest rate swaps, if properly selected and structured, may be a useful tool to alter the characteristics of a party's interest payments or receipts. For example, swapping floating rate payments for fixed rate payments in a time of rising interest rates may allow a party to avoid increased interest expense . . . .
>
> One of the benefits of an interest rate swap is the ability to liquidate the swap contract at any point in time. **It is important to realize, however, that should you liquidate the swap contract prior to maturity, you may realize a significant financial gain or a loss.**
>
> **Swaps Are for Financially Sophisticated Parties.** Interest rate swap transactions are designed primarily for sophisticated financial parties . . . . If, for any reason, you do not believe that you have a sufficient understanding or appreciation of the risks associated with a particular interest rate swap transaction, you should not enter into it . . . .
>
> **You Should Consult With Your Accounting, Tax and Legal Advisers before Entering into A Swap**.

---

calculated "by obtaining market quotations for the cost of replacing the swap at the time of termination." *Id*. The swap agreement between Compass and Durant also provided for this method to calculate payments on early termination.

Durant, however, testified that he did not review these risk disclosures prior to executing the swap agreement.[25]  And although the summary judgment evidence shows that Durant's attorney was involved in negotiating the terms of the note, the evidence also suggests that the attorney's involvement began sometime after the swap agreement had already been signed by Durant but prior to the time that Compass signed the swap agreement.[26]

The economic reality of this sophisticated financial transaction must be taken into account when construing the written documents that provide its

---

[25]The summary judgment evidence shows that Durant signed both the Master Agreement and the Schedule to the Master Agreement on March 24, 2008.  The Risk Disclosure was Exhibit B to the Schedule to the Master Agreement.

[26]In Durant's motion for partial summary judgment, he stated,

> The three documents constituting the Hedge Agreement were signed by Durant in March but not by Compass until on various dates in mid-April.  Before Compass signed the Hedge Agreement, it advised Durant's attorney, John Westhoff, that Compass was preparing the rest of the loan documentation.  When Mr. Westhoff later received drafts of those transaction documents, he told Compass they did not include a right to prepay the loan without penalty.

Durant cites to Exhibit C in the summary judgment evidence, a document identified as an "Affidavit of John Westhoff," but no such affidavit or Exhibit C appears in the record on appeal.

Compass attached Durant's interrogatory responses to its summary judgment motion, in which Durant was asked to identify "each person who was in any way involved in the due diligence conducted by you in connection with deciding to enter into the ISDA Master Agreement and/or Loan Documents."  As part of his response, Durant stated, "[Durant] consulted with his attorney, John Westhoff, before he executed the Loan Documents," but he did not state that he consulted John Westhoff before he executed the ISDA Master Agreement.

26

foundation. After having received written warnings about the potential for significant financial loss upon early termination of the swap contract and having employed an attorney to assist him in negotiating and crafting the very note that not only acknowledged the existence of the hedge agreement and Durant's obligations thereunder but incorporated the swap agreement's events of default and the consequences thereof into the note itself, Durant cannot now ignore it. *See Heritage Res., Inc.*, 939 S.W.2d at 121 ("We presume that the parties to a contract intend every clause to have some effect."). But in declaring that "Jerry Durant had the right to prepay the amount owed under the Promissory Note without payment of any penalty or fee, including any fee claimed by Compass under the Master Agreement, Schedule, and Confirmation," the trial court essentially allowed Durant to do just that. In effect, the trial court rewrote the note and deleted paragraphs 2 and 18, which explicitly acknowledge and incorporate Durant's obligations under the Master Agreement, Schedule, and Confirmation that provided for additional fees or payments upon early termination.

Whether the swap agreement and the loan agreement are part of one transaction or whether they constitute two separate, stand-alone transactions, the note unambiguously embraces the swap agreement such that any act of default under the swap agreement constitutes an act of default under the note as well, entitling Compass to all remedies provided for in the swap agreement. *See Bob Montgomery Chevrolet, Inc.,* 409 S.W.3d at 189. For these reasons, we

27

hold that the trial court erred in granting Durant's motion for summary judgment on his breach of contract and declaratory judgment actions.

## V.  Compass's Cross Motion for Summary Judgment
## on Durant's Breach of Contract and Declaratory Judgment Actions

Because both parties moved for summary judgment and the trial court granted one motion and denied the other,[27] we must review both parties' summary judgment evidence, determine all questions presented and render, if possible, the judgment that the trial court should have rendered.  *See Myrad Props., Inc.*, 300 S.W.3d at 753; *Mann Frankfort*, 289 S.W.3d at 848.  Having held that the trial court should have denied Durant's motion for summary judgment on breach of contract and for a declaratory judgment, we now turn to Compass's cross-motion for summary judgment to determine whether it should have been granted.

In its first two traditional summary judgment grounds, Compass challenged Durant's breach of contract action, and in its third and fourth traditional summary judgment grounds, Compass challenged Durant's declaratory judgment action.[28]

_____

[27]On October 23, 2014, the trial court signed an order denying Compass's traditional motion for summary judgment "in its entirety."  Although the November 19, 2015 final judgment did not explicitly incorporate the denial of Compass's traditional motion for summary judgment into its rulings, it did so implicitly, stating, "All relief requested in this case and not expressly granted in partial summary judgments incorporated herein or in this Final Judgment be and hereby is denied.  This Final Judgment finally disposes of all parties and claims in this action and is final and appealable."

[28]In seven other grounds, Compass challenged other causes of action originally brought by Durant, but those grounds are not at issue in this appeal.

28

## A. Breach of Contract Action

In the trial court, Compass argued that it was entitled to judgment as a matter of law on Durant's breach of contract action because: (1) "The plain terms of the Loan Documents establish that [Durant] was obligated to pay the Closeout Fee to Compass if he paid off the Promissory Note prior to the expiration of its term"; and (2) "The interpretation of the Loan Documents made the basis of Durant's claim for breach of contract is contrary to the plain terms of the Loan Documents."

In response, Durant argued that even if Compass was correct in its theory of liability under the note and other loan documents, a fact issue existed as to whether a breach occurred as to the actual amount that Compass could withhold as an early termination fee under the swap agreement, and that such fact issue precluded summary judgment. Durant included—as Exhibit "A" to his response—his affidavit in which he stated,

> Through my attorneys, I entered into an agreement with Compass that my payment of the demanded penalty would result in Compass's releasing its lien on my property, but that the payment would not waive or prejudice my right to challenge Compass's right to demand the penalty.

> At some point on August 29th, someone who claimed to be from Compass Bank called me to confirm that I wanted to terminate the [swap] Agreement. On that call I confirmed that I wanted to terminate the [swap] Agreement and acknowledged, as had been arranged through my lawyers, that I would pay the amount of the claimed penalty effective as of the time Compass received my payments, though without waiving my rights in this suit. During the call, I did not agree that, if a termination penalty was owed, the amount would be $790,350.00 exclusive of any other amount. In

29

fact, at the time of the call from Compass on August 29th, I did not have any actual knowledge of how Compass calculated the termination penalty it quoted me, nor had Compass provided me with the detailed termination statement required by the [swap] Agreement . . . .

. . . .

I did not agree that the amount quoted on the phone was an accurate calculation of the penalty, or that I was waiving the right to challenge the penalty in court.

To this day, Compass has never provided me with a statement or other explanation describing in any detail Compass's calculations of the claimed termination penalty, nor has it provided any quotations or other information supporting its August 29, 2013 calculation of the termination penalty amount.

. . . .

. . . I lost at least $10,605.00 due to what Compass claims was an intra-day rate change that occurred between 9:12 a.m. and the time Compass got around to terminating the [swap] Agreement and calculating the claimed penalty.

We agree that Durant's summary judgment evidence as recited above raised a fact issue that precluded the granting of Compass's traditional motion for summary judgment on Durant's breach of contract action. Thus, the trial court did not err in denying Compass's first and second grounds for summary judgment.

## B. Declaratory Judgment Action

Regarding Durant's declaratory judgment action, Compass argued in its third and fourth summary judgment grounds that "there is no justiciable controversy as to the rights and status of the parties," and that "Durant's

30

declaratory judgment claim is duplicative of his other claims." To support these grounds in its summary judgment motion, Compass exclusively relied upon opinions from federal courts and cited only to federal district court cases involving declaratory judgments in the context of dismissal, not summary judgment, proceedings.

First, when federal courts are called upon to consider a declaratory judgment action, they do not apply the Texas Declaratory Judgments Act (TDJA). Instead, the declaratory judgment action sought is "in effect converted into one brought under the federal Declaratory Judgment Act" when the case is removed to federal court. *See, e.g.*, *Redwood Resort Props., LLC v. Holmes Co.*, No. 3:06-CV-1022-D, 2007 WL 1266060, at *4 (N.D. Tex. Apr. 30, 2007). Thus, the grounds and law upon which Compass relied to seek summary judgment relief regarding Durant's declaratory judgment action do not govern actions brought under the TDJA in Texas courts.

More to the point, however, Compass's third and fourth summary judgment grounds are contrary to Texas law. *See MBM Fin. Corp. v. Woodlands Operating Co., L.P.,* 292 S.W.3d 660, 667–70 (Tex. 2009) (holding that under the TDJA, declarations of non-liability under a contract are permitted, both before and after a breach, and even when a breach of contract action is available); *Reynolds v. Sw. Bell Tel., L.P.*, No. 02-05-00356-CV, 2006 WL 1791606, at *5 (Tex. App.—Fort Worth June 29, 2006, pet. denied) (mem. op.) (citing *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995), for the proposition that,

31

for purposes of the TDJA, a "justiciable controversy" is more than merely a "hypothetical or contingent situation," a "theoretical dispute," or a question that is "not currently essential to the decision of an actual controversy," but, instead, is a "real and substantial controversy" that involves "a genuine conflict of tangible interests"). For these reasons, the trial court did not err by denying Compass's third and fourth grounds for summary judgment.

Therefore, we cannot render judgment on Compass's cross-motion for summary judgment.[29]

---

[29]With regard to the third ground, in so holding we focus on the ground as raised by Compass: "Compass is entitled to summary judgment on Durant's claim for declaratory judgment because *there is no justiciable controversy as to the rights and status of the parties* as Compass is entitled to collect the Closeout Fee pursuant to the parties' agreements." [Emphasis added.] *See* Tex. R. Civ. P. 166a(c); *State Farm Lloyds v. Page*, 315 S.W.3d 525, 532 (Tex. 2010) (stating that a "[s]ummary judgment may not be affirmed on appeal on a ground not presented to the trial court in the motion"). Both in the ground as stated in Compass's motion and in its argument in support of that ground, Compass claims entitlement to summary judgment because "there is no justiciable controversy as to the rights and status of the parties." The question of justiciability implicates subject matter jurisdiction and standing to bring a claim and does not turn on the merits of a particular cause of action. *See Heckman v. Williamson Cty.*, 369 S.W.3d 137, 162 (Tex. 2012) (discussing generally that justiciability is a component of standing and reiterating that the Texas constitution bars courts from deciding cases where there is no justiciable controversy); *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 305 (Tex. 2008) (explaining that failure to prevail on the merits of a claim does not mean that the party lacks standing); *Patterson v. Planned Parenthood of Houston & Se. Tex., Inc.*, 971 S.W.2d 439, 442 (Tex. 1998) (stating that ripeness "implicates subject matter jurisdiction, and like standing, emphasizes the need for a concrete injury for a justiciable claim to be presented") (citations omitted); *Lake v. Cravens*, 488 S.W.3d 867, 887–88 (Tex. App.—Fort Worth 2016, no pet.) (op. on reh'g) (discussing the distinction between a claim's justiciability and its merits). Thus, notwithstanding the disposition of Durant's breach of contract and declaratory judgment actions on appeal, our review of the propriety of trial court's denial of

32

## VI. The Award of Attorney's Fees to Durant on Breach of Contract and Declaratory Judgment Actions

In its fourth issue, Compass challenges the award of attorney's fees to Durant under sections 37 and 38 of the Texas Civil Practice and Remedies Code.[30]  *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (West 2015) (providing that, in any proceeding under the TDJA, the trial court may award reasonable and necessary attorney's fees that are equitable and just), § 38.001(8) (West 2015) (providing that a party may recover reasonable attorney's fees for a "valid" claim under an oral or written contract).

In light of our reversal of Durant's summary judgment related to his cause of action for breach of contract, the award of attorney's fees to Durant on this cause of action must also be reversed.  *See Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997)  ("To recover attorney's fees under Section 38.001, a party must (1) prevail on a cause of action for which attorney's fees are recoverable,

Compass's third ground for summary judgment is limited to the question presented to the trial court: the justiciability of the controversy, i.e., whether Durant asserted an "actual, real controversy," as opposed to a "future or speculative right." *Lane v. Baxter Healthcare Corp.*, 905 S.W.2d 39, 41 (Tex. App.—Houston [1st Dist.] 1995, no writ); *see also Laborers' Int'l Union of N. Am. v. Blackwell*, 482 S.W.2d 327, 329 (Tex. Civ. App.—Amarillo 1972, no writ) ("A controversy is justiciable when there are interested parties asserting adverse claims upon a state of facts which must have accrued wherein a legal decision is sought or demanded." (internal quotation omitted)).

[30]In its final judgment, the trial court awarded "attorneys' fees under Chapter 38 of the Texas Civil Practice & Remedies Code for breach of contract," and, in the alternative found that "it would be equitable and just for Durant to recover . . . reasonable and necessary attorneys' fees associated with prosecuting his declaratory judgment claims."

33

and (2) recover damages."). Therefore, we sustain this part of Compass's fourth issue.

However, with regard to Durant's declaratory judgment action, an award of attorney's fees is within the trial court's discretion and is not limited to the prevailing party. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009; *Barshop v. Medina Cty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 637 (Tex. 1996). Therefore, we remand the issue of attorney's fees under Chapter 37 to the trial court so that it may have an opportunity to reconsider the award of attorney's fees at the appropriate time. *See Edwards Aquifer Auth. v. Chem. Lime, Ltd.*, 291 S.W.3d 392, 405 (Tex. 2009) (stating the trial court should have the opportunity to reconsider its award of attorney's fees when claimant is no longer the prevailing party).

## VII. Conclusion

Having held that the trial court erred by granting summary judgment in favor of Durant and awarding attorney's fees to Durant as the prevailing party under his breach of contract action, but that the trial court did not err by denying Compass's cross-motion for summary judgment, we reverse the trial court's judgment and remand this case to the trial court for further proceedings consistent with this opinion.

/s/ Bonnie Sudderth
BONNIE SUDDERTH
JUSTICE

34

PANEL:  MEIER, GABRIEL, and SUDDERTH, JJ.

GABRIEL, J., filed a concurring and dissenting opinion.

DELIVERED:  January 5, 2017