

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00476-CV
_____

BYRON BERRY, Appellant

V.

THE NEW GAINESVILLE LIVESTOCK AUCTION, LLC, Appellee

On Appeal from the County Court at Law
Cooke County, Texas
Trial Court No. CV1801412

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

Byron Berry appeals the trial court's judgment on his deceptive-trade-practices claim against The New Gainesville Livestock Auction, LLC. *See* Tex. Bus. & Com. Code Ann. §§ 17.41–.63 (DTPA). In two issues, Berry asserts that the trial court erred (1) by entering judgment for the Auction on his DTPA claim because he proved that the Auction had misrepresented the pregnancy status of the cows sold to him and (2) by awarding the Auction its attorney's fees because they were not pleaded for. We will affirm in part and reverse and render in part. *See* Tex. R. App. P. 43.2(a), (c).

## I. Background

Since 2005, Berry has run a small cow-to-calf operation on forty treeless acres in Cooke County, Texas. With ranching not his primary occupation, Berry—an attorney and CPA—considers this to be the "easiest operation" in the cattle business because his forty "mama" cows do all the work with "little supervision." As Berry described the process, "[Y]ou buy cows, they have calves. You feed the cows. The cows feed the calves. And then at some point in time[,] you take the calves off the mamas or wean them and then sell them and then repeat the process."

To replace the older cows in his herd with younger ones, Berry occasionally attends what are known as replacement sales. In late October 2017, Berry attended such a sale at the Auction, looking primarily for cows with calves already by their side or, alternatively, pregnant cows that would deliver in the spring. Berry ended up buying eleven cows for $17,325. Over the next three weeks, Berry fed the cows daily

2

so that they would learn to come to his truck. Two months after buying them, and to Berry's surprise, the first cow gave birth on Christmas Eve 2017. Six more cows gave birth over the next two weeks; five of the seven calves survived. After the first calf was born, Berry resumed regularly checking on the cows until about March 2018, waiting for the other four cows to calve, but according to him, they never did. Berry then sued the Auction for breach of contract and for misrepresentation under the DTPA, claiming that the Auction had misrepresented the cows as spring calvers when they were not.

At trial, Berry was the sole witness for his case. For the defense, Darrell Kinnard, DVM and James Peyrot (the Auction's principal owner) testified.

## A. Berry's testimony

Berry explained that a buyer at auction has two ways to learn about whether a cow will give birth in the spring (or, presumably, at any particular time): orally and in writing. Orally, both the auction owner and the auctioneer announce the pen number, age, and gestation of the cows when they enter the ring. In writing, every cow is marked by two numbers, "one on the shoulder, which is the age, and a number on the hip" that "will tell you how many months they are along." According to Berry, the majority of the eleven cows that he bought had 4s on their hips, with two of them marked with 5s, indicating that they were in their fourth or fifth month of pregnancy.[1]

---

[1]At trial, Berry stated that a cow's gestation period "varies just like anything, but you generally plan on ten months, 270-something days" and agreed that he would

Berry testified that Peyrot had announced that these cows, which were shown as a group, were going to "spring in April and [that] they're heavy springers or whatever," with the auctioneer repeating essentially the same information along the lines of "we've got some good calves that are going to spring in -- or have calves in the spring." Berry bought the group of eleven cows "[b]ecause they were going to spring according to what . . . was represented and told and at the time they were going to have calves in April." When questioned by the trial court about his use of the term "heavy springer," Berry claimed that he had misspoken. The entire exchange went like this:

> THE COURT: For my benefit, when you say heavy springer, what do you mean?
>
> [Berry]: Well, . . . that's a misstatement. They're going to calf in the spring.
>
> [Berry's counsel]: You beat me to it.
>
> [Berry]: Ask me why I said heavy.
>
> Q. (By [Berry's counsel]) Why did you say heavy springers?
>
> A. They also mention sometimes that . . . they're bred to a light birth weight bull as opposed to a heavy bull and that's what was on my mind. They always say, yeah, they're bred to a low birth weight so that

---

"take the number on [its] hip" and "work back from ten months to figure out" how far along a cow was. In his deposition, Berry had testified that a cow's gestation period could last as long as twelve months; he testified at trial that cows marked with 4s, 5s, and 3s in late October would give birth in April. Dr. Kinnard and Peyrot both testified that cows gestate for only nine months. Asked if the period is "ever ten, 11[,] or 12 months," Peyrot flatly said, "No."

you'll think that they're going to have calves that are small. That's where I was confused.

Q. Okay. So heavy springer --

A. No, don't say that word, not heavy.[2]

In Berry's understanding, the numbers that he saw on the cows' hips and Peyrot's and the auctioneer's representations meant that the cows would give birth sometime in April; he would not have bought them if they were marked 7s, 8s, or 9s. Berry claimed that, at auction and for the next three weeks during his daily check-ins, he saw 4s and 5s on his cows' hips and so was shocked when seven of them calved over a two-week period beginning on Christmas Eve. Berry said that he resumed regularly checking on the cows after the first calf was born, but the remaining four never gave birth. Berry was sure that he did not miss the other four cows giving birth because he would have seen some physical sign of miscarriage or birth such as by seeing udders "bag up," looking at the cow's backside, or finding a carcass.[3]

---

[2]Low-birth-weight bulls produce smaller calves and are generally used to mate with heifers or smaller cows to make the birthing process easier. As Dr. Kinnard explained, a bull cannot produce a calf heavier than the bull's own birth weight.

[3]Berry stated that it would have been very hard for a carcass to go unnoticed on his forty acres as he was there every day. Berry also said that two of the cows came into heat immediately, which normally would not happen for a few months after calving. Berry apparently learned of the two cows' coming into heat from the fact that "the neighbor's bull got in and --." As the Auction suggests, that fact leaves open the possibility that calves might similarly have gotten *out* due to some issue with the property's enclosure.

**B. Dr. Kinnard's testimony**

Dr. Kinnard, who testified as an expert, is a veterinarian with forty-five years' experience. Since 2008, he has conducted cattle testing for the Auction by administering blood tests for brucellosis,[4] making pregnancy palpations,[5] and marking each cow's age and gestation on its left side using four-inch paint irons dipped in bright-green oil-based paint. Dr. Kinnard explained that veterinary technicians assist him by drawing blood and, after he tests it, writing down his findings on a federally mandated chart that he then submits to the Texas Animal Health Commission. His assistants also record the ages and gestation numbers on the chart as he calls out those numbers after examining each cow. Dr. Kinnard said that his work for the Auction constitutes ten percent at most of his veterinary practice.

Dr. Kinnard discussed a two-page exhibit on which Berry's cows (among others) were listed.[6] We reproduce below a snippet of the second page, on which nine of Berry's eleven cows appeared:

---

[4]Blood tests are mandated to aid in the tracking and eradication of certain diseases, and each cow is marked with a specific brucellosis ear-tag number.

[5]Dr. Kinnard explained the significant differences between palpating a cow at, say, three months versus seven months. At three months, the calf is about the size of a volleyball and is still within the pelvic cavity. At seven months, the uterus has dropped into the abdominal cavity, and the calf rotates up to the right side in preparation for birth. One can feel the calf's feet, legs, and head at this point as well.

[6]Dr. Kinnard tested some 1,350 cattle for the auction that Berry attended; only the two relevant pages from the entire chart were made a trial exhibit.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to, a collection of information unless it displays a valid OMB control number. The valid OMB control number for this collection of information is estimated to average 17 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the...

**UNITED STATES DEPARTMENT OF AGRICULTURE**
**ANIMAL AND PLANT HEALTH INSPECTION SERVICE**
**VETERINARY SERVICES**

BRUCELLOSIS TEST REG0RO- MARKET CATTLE TESTING PROG-M

SAMPLES DRAWN AT ("X" One) ☐ LIVESTOCK MARKETS ☐ SLAUGHTER ESTAB.

ESTAB. NO. 1828

NAME AND ADDRESS OF PLACE WHERE SAMPLES WERE DRAWN

The New Gainesville 4s
BOX 1055
Gainesville TX 76240

SIGNATURE Driscoll W Kinnard

| TUBE NO | SALES TAG OR BRAND | BACK TAG NUMBER | EAR TAG NUMBER | VACC TAT-TOO | AGE | BREED | SEX | CARD | FPA | 1W | CF | IN |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 201 | 7 | 036 | 74 GSH 4600 | | 3 | R | F | N | | | | |
| | 5 | 054 | GSX 8655 | | 0 | | | | | | | |
| | 6 | 055 | 47 VIJ 2534 | | 6 | | | | | | | |
| | 6 | 043 | 73 SVR 1297 | | 2 | | | | | | | |
| 205 | 5 | 046 | 74 GSH 4600 | | 6 | | | | | | | |
| | 0 | 032 | 73 SVH 6681 | | 3 | | | | | | | |
| | 6 | 040 | 74 GSH 4602 | | 2 | | | | | | | |
| | 0 | 034 | 73 SVR 1293 | | 2 | | | | | | | |
| | 5 | 056 | 74 GSH 4603 | | 5 | | | | | | | |
| 210 | 7 | 044 | 4604 | | H | | | | | | | |
| | 7 | 033 | 4605 | | 4 | | | | | | | |
| | 5 | 031 | 4606 | | H | | | | | | | |
| | 7 | 042 | 4607 | | 4 | | | | | | | |
| | 5 | 045 | 4608 | | 6 | | | | | | | |
| 215 | 6 | 057 | 73 SPC 3541 | | S | | | | | | | |
| | 7 | 052 | 47 GIJ 2064 | | 7 | | | | | | | |
| | 7 | 037 | 73 SVH 6678 | | 4 | | | | | | | |
| | 7 | 038 | 74 GSH 4609 | | H | | | | | | | |
| | 4 | 053 | 4610 | | 6 | | | | | | | |
| 220 | 4 | 051 | 47 VIJ 4722 | | 6 | | | | | | | |

VS 4-54 Previous editions are obsolete.
SEP201

Dr. Kinnard explained the chart data from left to right: month of gestation (0-9),[7] auction back-tag number, brucellosis ear-tag number, age, breed, and sex. Because a cow's gestation period is nine months, a cow marked with a 7 and sold in late October would be expected to calve between December 15 and January 15. The "R" in the "BREED" column signifies a red cow.

---

[7]Although the title of the left-hand column in which the numbers 0 through 9 appear is labeled "SALES TAG OR BRAND," Dr. Kinnard explained that the column reflects the gestational month.

The record contains the receipt for Berry's $17,325 payment for eleven "red cows," each identified by tag number. When the receipt's tag numbers are matched to the back-tag numbers on Dr. Kinnard's chart (which are identical except that the latter incorporates a leading zero) and the age and gestation information is included, we get the following compilation:

| Auction Back tag | Age | Gestation | | Auction Back tag | Age | Gestation |
|---|---|---|---|---|---|---|
| 031 | 4/H[8] | 5 | | 039 | 3 | 7 |
| 033 | 4 | 7 | | 040 | 2 | 6 |
| 035 | 3 | 7 | | 042 | 4 | 7 |
| 036 | 3 | 7 | | 043 | 2 | 6 |
| 037 | 4 | 7 | | 044 | 4/H | 7 |
| 038 | 4/H | 7 | | | | |

Dr. Kinnard did not recall Berry's particular cows, but because of his lengthy experience in examining pregnant cows, he typically assures his clients that whatever he marks on them, he will "be within [thirty] days" of when they are expected to calve. He was certain that he could not have "confused a seven with a three" or "a seven with a four" when applying paint to the cows' shoulders and hips. Similarly, he discounted the possibility that a buyer might have mistaken what the number was, testifying that "we keep the paint irons cleaned" and that "it's difficult to confuse the

---

[8]The handwritten figure that appears under "AGE" on the chart image above is either a 4 or an H, the latter of which we assume would mean a heifer—a young cow that has not given birth for the first time. Whatever the case, the gestation period for this cow is clearly marked 5. The same "4 or H?" question could be asked of cows numbered 38 and 44, but for each of them, the recorded gestation stage is plainly 7.

numbers." In any event, according to Dr. Kinnard, if a buyer cannot discern the painted numbers, "they can ask the auctioneer[,] and . . . they will tell them what [the numbers] are." Dr. Kinnard also opined that a "cow man" would recognize the physical signs of a cow in her last trimester of pregnancy and said that Berry was the only person to later complain about cows sold at that auction.

When shown photographs that were taken at Berry's ranch of some of his cows, Dr. Kinnard noted that no traces of green paint remained (and thus no visual evidence of the cows' gestational-age hip markings from the auction). But because the pictures had been taken roughly three months after the auction, Dr. Kinnard agreed that the paint could have washed off naturally by then.

Of note, Dr. Kinnard testified that a "springer" means a cow in her last trimester—showing physical signs of heavy pregnancy in months "seven, eight, [or] nine"[9]—and that the term has "[n]othing whatsoever" to do with the "seasonal time of the year." Dr. Kinnard said that there is "[a]bsolutely" a difference between "a cow designated to calve in the spring versus a cow called a springer." He explained that a "springer" simply "identif[ies] a physical condition of the cow and the stage of her pregnancy[,] which is the last trimester, period. . . . A springer can give birth any time, any day, any month."

---

[9]Those physical signs include udder development, relaxation of the pubic tendon, swelling of the vulva, and vaginal discharge (mucus plug).

9

## C. Peyrot's testimony

Peyrot testified that the majority of cows sold at replacement sales are "bred," that is, pregnant. Peyrot said that the only reason a replacement sale might include an "open" (not pregnant) cow is if it is a young heifer that has not yet tried to breed; open cows are otherwise sold at the regular Friday sales.

Peyrot testified that the auction facility has a large monitor that displays the types of information that would be marked on a cow. An exemplar screenshot was made an exhibit:



Peyrot testified that in addition to the Auction's providing this information key for potential buyers, he makes oral announcements about the cows so that buyers

know what they are bidding on.[10] Peyrot explained that Berry's eleven cows would have been brought into the ring as a presorted group because they were all close in age and gestation status, "so they all fit together" as "just a uniform set basically." When announcing each cow's age and pregnancy, Peyrot said that he relies on the bright green markings rather than the "vet sheets," which he does not "mess with." Peyrot also explained that each cow has two back tags affixed with adhesive, which the auction uses to identify each cow.[11] Peyrot said that these yellow tags are placed on each hip and very rarely fall off. Peyrot estimated that in a Friday sale with 2,000 cattle, "none to one" might need to be replaced, and when a tag does come off, it is typically from a calf, not a cow.

Peyrot did not remember Berry's eleven cows specifically, but since (like Dr. Kinnard) he uses the term "springer" (or "heavy springer" when selling cows "in their last trimester, some heavy bred cows"), he might well have represented Berry's cows as springers because of their pregnancy status. But Peyrot would not have represented the cows as spring calvers because they were "too far bred." In a colloquy with the trial court, Peyrot explained further:

THE COURT: . . . Do you recall if you made any such representation?

---

[10]Peyrot's regular practice is to announce the pen number, age, and gestation. The pen numbers are announced because some buyers inspect and choose the cows in their pens before the auction begins.

[11]The back-tag number is the identification number on each buyer's receipt.

11

[Peyrot]: No, I don't recall, but on a heavy bred cow I wouldn't have called her a spring calver in October because she wouldn't calve. . . . She would be a fall calver if she would have been a heavy springer is what we would call her basically.

THE COURT: Okay. Heavy springer to you means late in the pregnancy?

[Peyrot]: Yeah, she's fixing to calve --

THE COURT: Not they're going to calve in the spring of the year?

[Peyrot]: No. Huh-uh. No.

**D. The trial court's judgment; posttrial proceedings**

At the trial's beginning, the trial court stated that it had "noticed [that] both sides ha[d] asked for attorney's fees." The trial court further stated that the case "is a contract case" and asked the parties if they could stipulate that they would submit their attorney's fees by affidavit. Both parties agreed to do so and filed their affidavits within two days after the trial ended. With the cover letter accompanying his fee affidavit, Berry's counsel attached the Auction's live pleading "for the sake of clarification" and pointed out that the Auction "ha[d] no active claim for attorney[']s fees." The trial court entered judgment that the Auction had not breached its contract with Berry, nor had it "committed a false, misleading, or deceptive trade practice [or] caused injury to Byron Berry." The trial court awarded the Auction its "reasonable and necessary attorney[']s fees in the amount of $15,563.22," which the Auction had incurred "as it was required to defend itself against the claims asserted by Plaintiff Byron Berry."

12

Berry moved for a new trial and to strike the Auction's attorney's-fee application as having no pleadings to support it; he simultaneously requested findings of fact and conclusions of law, which the trial court made. After the trial court denied Berry's motions, he timely appealed. On appeal, Berry does not raise any arguments related to his breach-of-contract claim.

## II. Evidentiary-Sufficiency Challenges

In his first issue, Berry raises legal- and factual-sufficiency arguments in connection with his unsuccessful DTPA claim.

### A. Standard of Review

A trial court's findings of fact have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). As with jury findings, a trial court's fact findings on disputed issues are not conclusive, and when the appellate record contains a reporter's record, an appellant may challenge those findings for evidentiary sufficiency. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Super Ventures, Inc. v. Chaudhry*, 501 S.W.3d 121, 126 (Tex. App.—Fort Worth 2016, no pet.). We review the sufficiency of the evidence supporting challenged findings using the same standards that we apply to jury findings. *Catalina*, 881 S.W.2d at 297.

When a party attacks the legal sufficiency of an adverse finding on an issue on which the party had the burden of proof, the party must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow*

13

*Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). In reviewing a "matter of law" challenge, we first examine the record for evidence that supports the challenged finding, ignoring all evidence to the contrary. *Id.* If no evidence supports the finding, we then examine the entire record to determine if the contrary position is established as a matter of law. *Id.* We will sustain the issue only if the contrary position is conclusively established. *Id.* Evidence conclusively establishes a fact when it leaves "no room for ordinary minds to differ as to the conclusion to be drawn from it." *Int'l Bus. Machs. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 235 (Tex. 2019).

When a party raises a factual-sufficiency challenge to an adverse finding on an issue on which it has the burden of proof, the party must show that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem.*, 46 S.W.3d at 242. We "must consider and weigh all of the evidence, and [we] can set aside [the judgment] only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id.*

Even if we might decide a matter differently, we cannot substitute our own view of the facts: the trier of fact is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998); *see also Bell Helicopter Textron, Inc. v. Burnett*, 552 S.W.3d 901, 913 (Tex. App.—Fort Worth 2018, pet. denied) (stating that in bench trial, trial court as

14

factfinder is sole judge of witness credibility and can accept or reject all or any part of witnesses' testimony).

**B. Application**

A successful DTPA plaintiff must prove (1) that he is a consumer; (2) that the defendant engaged in false, misleading, or deceptive acts; and (3) that these acts constituted a producing cause of the plaintiff's damages. *Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d 472, 478 (Tex. 1995). Berry argues that he proved that the Auction committed two types of false, misleading, or deceptive acts under the DTPA by "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have" or by "representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Tex. Bus. & Com. Code Ann. § 17.46(b)(5), (7).

Despite mentioning more of the findings of fact in his issue, Berry briefs and argues only one—the one in which the trial court found "no evidence to show that Dr. Kinnard's records were incorrect or that the numbers painted on the eleven cows were incorrect." We review fact findings that are briefed rather than those that are specified only in an issue. *See, e.g.*, *Tarbox v. Thomson*, No. 09-07-213-CV, 2008 WL 4735432, at *2 (Tex. App.—Beaumont Oct. 30, 2008, pet. denied) (mem. op.) (noting that although appellant's issue assailed fourteen findings of fact for insufficiency, appellate court would limit review to the nine that appellant actually

15

briefed (citing Tex. R. App. P. 38.1(h))). Thus, although Berry's first issue takes aim at a second factual finding and several conclusions that are really findings of fact,[12] we will examine evidentiary sufficiency as it relates to the quoted finding: whether Berry proved as a matter of law that Dr. Kinnard's records or the cows' painted hip numbers were incorrect or, alternatively, whether the trial court's contrary finding was against the great weight and preponderance of the evidence.

Berry's position is that because he testified that 4s and 5s were painted on the cows' hips and because no evidence contradicted his testimony, he had "proved, as a matter of law, that the pregnancy status represented for all of the cattle was wrong." That is, "the *only* evidence was that the numbers painted on the cows *were* incorrect. The only evidence was that the numbers were all 4s and 5s, which Mr. Berry saw at the auction and every day for three weeks afterwards." The Auction's misrepresentation, in Berry's view, came from the fact that the cows should actually have been marked with seven 7s and four Øs.

A factfinder "may disbelieve an interested witness even if uncontradicted." *McGuffin v. Terrell*, 732 S.W.2d 425, 428 (Tex. App.—Fort Worth 1987, no writ). The trial court was thus not obligated to accept Berry's version of the facts—and in any

---

[12]For example, in its first "Conclusion," the trial court wrote that Berry "had a misunderstanding about the meaning of the term 'heavy springer' thinking it meant that the pregnant cows would give birth to calves in the spring rather [than] that the cows were late in their pregnancy." The trial court's second conclusion was that "the eleven cows were correctly marked as [to] the status of pregnancy and that Plaintiff Berry did not look at the painted numbers or misunderstood them."

event, Berry's testimony was not uncontradicted. Although neither Dr. Kinnard nor Peyrot recalled the exact cows in question, both testified about their usual practices and their experience in testing and selling bred cows. Dr. Kinnard's testimony—that he would not have used the wrong paint irons to number the cows and that he keeps his paint irons clean—and the records of the gestation statuses he called out to his vet techs after palpating the cows created a fact issue that the trial court resolved in the Auction's favor. Additionally, Berry's insistence that it was undisputed that four of the cows were never pregnant is undermined by Dr. Kinnard's records, by Peyrot's testimony that he groups similar cows together for the ring, and by the possibility that Berry's enclosure could have been breached, allowing calves to wander off.[13] In short, the evidence does not establish as a matter of law either that Dr. Kinnard's records were wrong or that the cows were mismarked.

Nor was this fact finding against the great weight and preponderance of the evidence. Berry argues that "[a]lthough Dr. Kinnard's records were irrelevant to the issue of what representations were made by the [ ] Auction, there was ample evidence that his records *were* wrong. Dr. Kinnard's records could not verify that the sale i.d. numbers for each cow sold to Mr. Berry were correct," despite the fact that the records matched up with the receipt. Berry again points to the seven cows that calved

---

[13]Additionally, the absence of any calf carcasses does not necessarily prove that the cows were never pregnant. As the adage has it, "The absence of evidence is not evidence of absence."

17

in late December and into January, cows that he argues should have been marked 7s, and the four for which he never saw evidence of calving, cows that he says should have been Øs. Berry also contends that the Auction could have proved the representations made at the replacement sale by, for example, having a video or audio recording of the auction. But the Auction did not have the burden to prove that its representations were correct; Berry had to prove that they were incorrect. Even ignoring the Auction's documentary and testimonial evidence, the trial court did not have to accept Berry's testimony that he saw 4s and 5s.[14]

We overrule Berry's first issue.

### III. Attorney's Fees

In his second issue, Berry challenges the award of attorney's fees to the Auction, an issue that we review de novo. *See Severs v. Mira Vista Homeowners Ass'n, Inc.*, 559 S.W.3d 684, 712 (Tex. App.—Fort Worth 2018, pet. denied). We agree with Berry that the Auction did not plead for attorney's fees and that no statute mandates their recovery.

The stated basis on which the trial court awarded fees to the Auction was its general prayer for relief. Such a prayer will not support an award of attorney's fees. *See*

---

[14]And although Berry has not briefed a challenge to the trial court's findings that Peyrot had used the term "heavy springer" at auction and that Berry had misunderstood what that term meant, the testimony we have discussed above amply supports those findings.

*Alan Reuber Chevrolet, Inc. v. Grady Chevrolet, Ltd.*, 287 S.W.3d 877, 884 (Tex. App.—Dallas 2009, no pet.).

The Auction's only response is that the issue had been tried by consent because Berry did not correct the trial court's misunderstanding that both sides were seeking their fees until pointing it out after trial when submitting his attorney's-fee affidavit.[15] The doctrine of trial by consent is "only intended to cover the exceptional case in which it clearly appears from the record as a whole that the parties tried the unplead[ed] issue." *In re A.B.H.*, 266 S.W.3d 596, 600 (Tex. App.—Fort Worth 2008, no pet.) (op. on reh'g). The doctrine "should be applied with care, and in no event in a doubtful situation." *Id.* We cannot agree that Berry's failure to mention the state of the Auction's pleadings until after trial—the point in the proceedings at which fee evidence was presented for the first time—brings this case within the trial-by-consent doctrine. That is particularly so because "[a]bsent a mandatory statute, a trial court's jurisdiction to render a judgment for attorney's fees must be invoked by pleadings, and a judgment not supported by pleadings requesting an award of attorney's fees is a nullity." *Whitmire v. Nat'l Cutting Horse Ass'n*, No. 02-11-00170-CV, 2012 WL 4815413, at *13 (Tex. App.—Fort Worth Oct. 11, 2012, no pet.) (mem. op.) (quoting *Alan Reuber Chevrolet*, 287 S.W.3d at 884).

---

[15]The Auction does not explain why its own counsel should not have spoken up when the trial court mentioned both sides' seeking attorney's fees since the Auction had not pleaded for them.

Even if the Auction could overcome this jurisdictional hurdle, neither the DTPA nor Section 38.001 of the Civil Practice and Remedies Code supports the trial court's award. *See* Tex. Bus. & Com. Code Ann. § 17.50(c); Tex. Civ. Prac. & Rem. Code Ann. § 38.001. Under the DTPA, a successful defendant can recover its attorney's fees only by pleading and proving that the plaintiff's action was groundless in fact or law or brought in bad faith or for purposes of harassment. Tex. Bus. & Com. Code Ann. § 17.50(c). The Auction did not prove either groundlessness or bad faith, much less obtain the requisite findings. In a contract case involving Section 38.001, a party cannot recover its attorney's fees unless it also recovers damages. *See Compass Bank v. Durant*, 516 S.W.3d 557, 575 (Tex. App.—Fort Worth 2017, pet. denied). Even if the Auction had pleaded for its attorney's fees, the trial court did not award the Auction any affirmative relief that would support such an award.

We sustain Berry's second issue.

## IV. Conclusion

Having sustained Berry's second issue, we reverse the part of the trial court's judgment awarding attorney's fees to the Auction and render judgment that the Auction take nothing on its attorney's-fee claim. *See* Tex. R. App. P. 43.2(c). Having overruled Berry's first issue, we affirm the remainder of the trial court's judgment. *See* Tex. R. App. P. 43.2(a).

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered:  January 13, 2022